**Nos. 11-4406, 11-4407, 11-4408 (consolidated)**

# *United States Court of Appeals*
### For the Third Circuit

UNITED STATES OF AMERICA, *et al.*,
*Plaintiffs-Appellants*,

v.

EME HOMER CITY GENERATION L.P., *et al.*,
*Defendants-Appellees*.

**On Appeal from the United States District Court for the Western District of Pennsylvania, No. 2:11-cv-19 (Hon. Terrence F. McVerry)**

## JOINT RESPONSE BRIEF FOR DEFENDANTS-APPELLEES
## EME HOMER CITY GENERATION, L.P. AND HOMER CITY OL1-OL8, LLCs

Chet M. Thompson
Jeffrey L. Poston
David Y. Chung
Providence Spina
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2505
Telephone: (202) 624-2500
Facsimile: (202) 628-5116

Peter T. Stinson
W. Alan Torrance, Jr.
DICKIE, MCCAMEY & CHILCOTE
Two PPG Place, Suite 400
Pittsburgh, PA 15222
Telephone: (412) 392-5432
Facsimile: (888) 811-7144

*Attorneys for Defendants-Appellees
Homer City OL1-OL8, LLCs*

James M. Jones
Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219-2514
Telephone: (412) 391-3939
Facsimile: (412) 394-7959

Stephen J. Bonebrake
Andrew N. Sawula
SCHIFF HARDIN LLP
233 S. Wacker, Suite 6600
Chicago, IL 60606-6473
Telephone: (312) 258-5500
Facsimile: (312) 258-5600

*Attorneys for Defendant-Appellee
EME Homer City Generation, L.P.*

**(additional counsel listed on inside cover)**

Daniel E. Reidy
Brian J. Murray
JONES DAY
77 West Wacker Drive
Suite 3500
Chicago, Illinois  60601-1692
Telephone:  (312) 782-3939
Facsimile:  (312) 782-8585

Kevin Holewinski
Thomas J. Davis
James M. Burnham
JONES DAY
51 Louisiana Avenue, NW
Washington, DC 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700

*Attorneys for Defendant-Appellee
EME Homer City Generation, L.P.*

## CORPORATE DISCLOSURE STATEMENT AND STATEMENT OF FINANCIAL INTEREST FOR EME HOMER CITY GENERATION, L.P.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, Defendant-Appellee EME Homer City Generation, L.P. ("EME") makes the following disclosure:

1)    *For non-governmental corporate parties, please list all parent corporations*:

EME Homer City Generation, L.P. is a limited partnership.  Mission Energy Westside, Inc., a California corporation, is its general partner, and Chestnut Ridge Energy Company, a California corporation, is its limited partner.  Mission Energy Westside, Inc. and Chestnut Ridge Energy Company are both wholly-owned subsidiaries of Edison Mission Holdings Company, which, in turn, is a wholly-owned subsidiary of Edison Mission Energy.  Edison Mission Energy is a Delaware corporation, which is a wholly-owned subsidiary of Mission Energy Holdings Company, a Delaware corporation.  Mission Energy Holdings Company is a wholly-owned subsidiary of Edison Mission Group Inc., a Delaware corporation, which in turn, is a wholly-owned subsidiary of Edison International, a California corporation.

2)    *For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock*:

Of the corporate enterprises affiliated with EME, only Edison International has issued shares or debt securities to the public.  There are no other publicly held companies that own 10% or more of defendant-appellee EME Homer City Generation, L.P.

*3)    If there is a publicly held corporation which is not a party to the proceeding before this Court but which has a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests*:

EME Homer City Generation, L.P. defers to the OLs and the statements in their attached disclosure statement as to the interest of General Electric Company and its related entities, if any, in the outcome of this litigation.

Respectfully submitted,

/s/ James M. Jones
James M. Jones
Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939

Stephen J. Bonebrake
Andrew N. Sawula
SCHIFF HARDIN LLP
233 S. Wacker, Suite 6600
Chicago, IL 60606-6473
Telephone: (312) 258-5500
Facsimile: (312) 258-5600

Kevin P. Holewinski
Thomas J. Davis
James M. Burnham
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939

Daniel E. Reidy
Brian J. Murray
JONES DAY
77 W. Wacker, Suite 3500
Chicago, IL 60601
(312) 782-3939

*Attorneys for Defendant-Appellee EME Homer City Generation, L.P.*

**CORPORATE DISCLOSURE STATEMENT AND
STATEMENT OF FINANCIAL INTEREST FOR DEFENDANT-
APPELLEES
HOMER CITY OL1, LLC; HOMER CITY OL2, LLC; HOMER CITY OL3,
LLC; HOMER CITY OL4, LLC; HOMER CITY OL5, LLC; HOMER CITY
OL6, LLC; HOMER CITY OL7, LLC; AND HOMER CITY OL8, LLC**

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, Defendant-Appellees

Homer City OL1, LLC, Homer City OL2, LLC, Homer City OL3, LLC, Homer

City OL4, LLC, Homer City OL5, LLC, Homer City OL6, LLC, Homer City OL7,

LLC, and Homer City OL8, LLC ("Defendant-Appellees") make the following

disclosures:

**1) For non-governmental corporate parties please list all parent
corporations:**

The Defendant-Appellees (except Homer City OL6, LLC) filing this

Disclosure Statement were previously wholly-owned subsidiaries of General

Electric Capital Corporation, a Delaware corporation.  General Electric Capital

Corporation is a wholly-owned subsidiary of General Electric Capital Services,

Inc., a Delaware corporation.  General Electric Capital Services, Inc. is a wholly-

owned subsidiary of General Electric Company, a New York corporation.

Defendant-Appellee Homer City OL6, LLC was previously wholly-owned

by Metropolitan Life Insurance Company, a New York corporation.  Metropolitan

Life Insurance Company is a wholly-owned subsidiary of MetLife, Inc., a Delaware corporation.

On December 14, 2012, all eight Defendant-Appellees were merged into Homer City Generation, LP, a limited partnership.  Homer City Generation, LP is owned indirectly by General Electric Capital Corporation, a Delaware Corporation, and Metropolitan Life Insurance Company, a New York corporation.  General Electric Capital Corporation is a wholly-owned subsidiary of General Electric Capital Services, Inc., a Delaware corporation.  General Electric Capital Services, Inc. is a wholly-owned subsidiary of General Electric Company, a New York corporation.  Metropolitan Life Insurance Company is a wholly-owned subsidiary of MetLife, Inc., a Delaware Corporation.

**2) For non-governmental corporate parties, please list all publicly held companies that hold 10% or more of the party's stock:**

The Defendant-Appellees (except Homer City OL6, LLC) filing this Disclosure Statement were previously limited liability companies wholly owned by General Electric Capital Corporation.  General Electric Capital Corporation is a wholly-owned subsidiary of General Electric Capital Services, Inc.  General Electric Capital Services, Inc. is a wholly-owned subsidiary of General Electric Company, a publicly held company.  No other publicly held company owned 10%

or more of the Defendant-Appellees (except Homer City OL6, LLC) filing this disclosure statement.

Prior to December 14, 2012, no publicly held companies held 10% or more of Homer City OL6, LLC's stock.

Since the filing of this appeal, all eight Defendant-Appellees have been merged into Homer City Generation, LP, a limited partnership. Homer City Generation, LP is owned indirectly by General Electric Capital Corporation, a Delaware Corporation, and Metropolitan Life Insurance Company, a New York corporation. General Electric Capital Corporation is a wholly-owned subsidiary of General Electric Capital Services, Inc., a Delaware corporation. General Electric Capital Services, Inc. is a wholly-owned subsidiary of General Electric Company, a publicly held corporation. Metropolitan Life Insurance Company is a wholly-owned subsidiary of MetLife, Inc., a Delaware Corporation. No other publicly held company owns 10% or more of Homer City Generation, LP.

**3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:**

General Electric Company, a publicly held corporation, has a financial interest in the outcome of this proceeding because its wholly-owned subsidiary

General Electric Capital Services, Inc. wholly owns a subsidiary, General Electric Capital Corporation, which in turn wholly owned the Defendant-Appellees (except Homer City OL6, LLC) filing this Disclosure Statement.

MetLife, Inc., a publicly held corporation, has a financial interest in the outcome of this proceeding because its wholly-owned subsidiary Metropolitan Life Insurance Company wholly owned Homer City OL6, LLC, which is a Defendant-Appellee in this matter.

On December 14, 2012, all eight Defendant-Appellees were merged into Homer City Generation, LP, a limited partnership.  General Electric Company and MetLife, Inc., publicly held corporations, continue to have a financial interest in the outcome of this proceeding.  General Electric Company's wholly owned subsidiary General Electric Capital Services, Inc., wholly owns General Electric Capital Corporation, which indirectly owns Homer City Generation, LP.  MetLife, Inc.'s wholly-owned subsidiary Metropolitan Life Insurance Company also indirectly owns Homer City Generation, LP.  Defendant-Appellees were merged into Homer City Generation, LP.

The Defendant-Appellees filing this Disclosure Statement are not aware of any publicly held corporation which is not a party to the proceeding but which has a financial interest in the outcome of the proceeding other than those named in this Disclosure Statement.

Respectfully submitted,

/s/ Chet Thompson

Peter T. Stinson (PA39044)
W. Alan Torrance, Jr. (PA49592)
DICKIE, McCAMEY & CHILCOTE, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402
Telephone: (412) 281-7272
Facsimile: (412) 392-5367
pstinson@dmclaw.com

Chet M. Thompson (DC448559)
Jeffrey L. Poston (DC426178)
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Telephone: (202) 624-2500
Facsimile: (202) 628-5116
cthompson@crowell.com

*Attorneys for Homer City OL1, LLC; Homer City OL2, LLC; Homer City OL3, LLC; Homer City OL4, LLC; Homer City OL5, LLC; Homer City OL6, LLC; Homer City OL7, LLC; and Homer City OL8, LLC*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... iii

TABLE OF ABBREVIATIONS ...............................................................x

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES.............................................................1

INTRODUCTION .................................................................................2

STATEMENT OF THE CASE.................................................................5

STATEMENT OF FACTS .....................................................................5

    A.    The Clean Air Act Framework ...................................................5

        1.    The CAA's PSD Program.................................................6

        2.    The CAA's Title V Provisions..........................................8

        3.    The CAA's Enforcement Provisions .................................9

        4.    Pennsylvania's Plan Approval And Operating Requirements ................................................................10

    B.    Proceedings And Disposition Below .................................12

SUMMARY OF ARGUMENT ..............................................................16

ARGUMENT .....................................................................................20

I.    THE CAA's PSD PROVISIONS ESTABLISH PRECONSTRUCTION PERMIT OBLIGATIONS ONLY, SUBJECT TO A FIVE-YEAR STATUTE OF LIMITATIONS ...................................20

    A.    The Plain Language Of The PSD Provisions Prohibits Only The Act Of Construction Without A Permit And Not Subsequent Ownership Or Operation ...................................................20

    B.    The Government's Contrary Contentions Are Meritless ..................28

        1.    BACT Is Part Of The Preconstruction Permitting Process Only, Does Not Exist In The Abstract, And Does Not Impose A Free-Standing Obligation .......................................29

        2.    The Government Has Not Identified Any Other Pennsylvania SIP Provision That Prohibits Operation Without A PSD Permit..............................................37

# TABLE OF CONTENTS
(continued)

**Page**

    C.    The Government's PSD Penalty Claims Are Barred By The Statute Of Limitations ........................................................................41

II.    THE CLEAN AIR ACT DOES NOT AUTHORIZE THE GOVERNMENT OR THE STATES TO SUE SUBSEQUENT PURCHASERS WHO DID NOT COMMIT ANY ALLEGED VIOLATIONS ............................................................................42

III.    THE GOVERNMENT'S ALLEGED "POLICY CONCERNS" ARE BASELESS AND DO NOT CHANGE THE CAA'S PLAIN TEXT ........44

IV.    THE GOVERNMENT'S TITLE V CLAIMS ARE MERITLESS.............48

    A.    Title V Does Not Create An Independent Cause Of Action For PSD Violations .....................................................................49

    B.    Title V Does Not Authorize "Inadequate" Permit Claims.................51

    C.    Title V's "Permit Shield" Provision Confirms That The Government's Derivative Title V Claims Are Not Actionable ........54

    D.    The States Have Not Alleged Sufficient Facts In Support Of Their Claimed Violation Of EME's And The OLs' Title V Permit .............................................................................55

CONCLUSION .................................................................................56

COMBINED CERTIFICATIONS

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Alaska Dep't of Envtl. Conservation v. EPA,*
  540 U.S. 461 (2004) ........................................................6

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ........................................................56

*Barnhart v. Sigmon Coal Co.,*
  534 U.S. 438 (2002) ........................................................24

*Carr v. Alta Verde Indus., Inc.,*
  931 F.2d 1055 (5th Cir. 1991) ........................................27

*Cheng v. Attorney General,*
  623 F.3d 175 (3d Cir. 2010) ...........................................20

*Citizens Against Ruining the Env't v. EPA,*
  535 F.3d 670 (7th Cir. 2008) ....................................50, 55

*CleanCOALition v. TXU Power,*
  536 F.3d 469 (5th Cir. 2008) ....................................24, 26

*Commonwealth v. Allegheny Energy Inc.,*
  No. 2:05-cv-885, 2006 WL 1520650 (W.D. Pa. May 30, 2006) ..............25, 52

*Commonwealth v. Allegheny Energy Inc.,*
  No. Civ.A. 05-885, 2006 WL 1509061 (W.D. Pa. Apr. 19, 2006) ....................25

*Gallo Cattle Co. v. USDA,*
  159 F.3d 1194 (9th Cir. 1998) ........................................43

*Harmon Indus., Inc. v. Browner,*
  19 F. Supp. 2d 988 (W.D. Mo. 1998) ................................27

*Ieradi v. Mylan Labs., Inc.,*
  230 F.3d 594 (3d Cir. 2000) ...........................................47

*Int'l B'hood of Elec. Workers, Local 336 v. Ill. Bell Tel. Co.,*
  496 F.2d 1 (7th Cir. 1974) .............................................43

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Lamie v. U.S. Tr.*,
540 U.S. 526 (2004)..........................................................................20

*Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*,
480 F.3d 410 (6th Cir. 2007) .....................................................25, 40

*National Parks & Conservation Association, Inc. v. Tennessee Valley
Authority*,
502 F.3d 1316 (11th Cir. 2007) ..............................................*passim*

*New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC*,
No. 07-CV-5298, 2009 WL 3234438 (E.D. Pa. Sept. 30, 2009).......................35

*New York v. Am. Elec. Power Serv. Corp.*,
Nos. 2:04 cv 1098, 2:05 cv 360, 2006 WL 1331543
(S.D. Ohio Mar. 21, 2006)......................................................25, 35

*New York v. Niagara Mohawk Power Corp.*,
263 F. Supp. 2d 650 (W.D.N.Y. 2003)...................................25, 26, 52

*New York v. Niagara Mohawk Power Corp.*,
No. 02-cv-24S, 2003 WL 23356447 (W.D.N.Y. Dec. 31, 2003)................35, 52

*Newell Recycling Co. v. U.S. EPA*,
231 F.3d 204 (5th Cir. 2000) .......................................................27

*Pub. Interest Research Group of New Jersey, Inc. v. Windall*,
51 F.3d 1179 (3d Cir. 1995) .......................................................56

*Sec'y of Labor v. Beverly Healthcare-Hillview*,
541 F.3d 193 (3d Cir. 2008) .......................................................21

*Sierra Club v. Dairyland Power Coop.*,
No. 10-cv-303-bbc, 2010 WL 4294622 (W.D. Wis. Oct. 22, 2010).................32

*Sierra Club v. EPA*,
551 F.3d 1019 (D.C. Cir. 2008).......................................................9

*Sierra Club v. Franklin County Power of Ill., LLC*,
546 F.3d 918 (7th Cir. 2008) .......................................................22

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Sierra Club v. Indiana-Kentucky Elec. Corp.*,
   716 F.2d 1145 (7th Cir. 1983) .................................................................51

*Sierra Club v. Otter Tail Corp.*,
   608 F. Supp. 2d 1120 (D.S.D. 2009) ..........................................25, 33

*Sierra Club v. Otter Tail Power Co.*,
   615 F.3d 1008 (8th Cir. 2010) ...................................................*passim*

*Solar Turbines Inc. v. Seif*,
   879 F.2d 1073 (3d Cir. 1989) .......................................................6

*United States v. AM Gen. Corp.*,
   34 F.3d 472 (7th Cir. 1994) ........................................................42, 53

*United States v. Bowen*,
   100 U.S. 508 (1879).......................................................................43

*United States v. Brotech Corp.*,
   No. Civ.A. 00-2428, 2000 WL 1368023 (E.D. Pa. Sept. 19, 2000).............25, 26

*United States v. Cemex, Inc.*,
   864 F. Supp. 2d 1040 (D. Colo. 2012)...........................................51

*United States v. Cinergy Corp.*,
   397 F. Supp. 2d 1025 (S.D. Ind. 2005)..........................................25

*United States v. Cinergy Corp.*,
   458 F.3d 705 (7th Cir. 2006) ......................................................7, 17

*United States v. East Kentucky Power Cooperative*,
   498 F. Supp. 2d 1010 (E.D. Ky. 2007) .........................................52

*United States v. Gooding*,
   25 U.S. (12 Wheat.) 460 (1827) .................................................43

*United States v. Ill. Power Co.*,
   245 F. Supp. 2d 951 (S.D. Ill. 2003).....................................24, 34, 35

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Louisiana Generating, LLC*,
   No. 09-100-JJB-CN, 2011 WL 6012997 (M.D. La. Dec. 1, 2011)........35, 36, 52

*United States v. Marine Shale Processors*,
   81 F.3d 1329 (5th Cir. 1996), (U.S.Br.33, 38; St.Br.37).............................26, 36

*United States v. Midwest Generation, LLC*,
   781 F. Supp. 2d 677 (N.D. Ill. 2011)...........................................................50, 52

*United States v. Midwest Generation, LLP*,
   694 F. Supp. 2d 999 (N.D. Ill. 2010)....................................................19, 25, 45

*United States v. Murphy Oil*,
   143 F. Supp. 2d 1054 (W.D. Wis. 2001) ...........................................................26

*United States v. Ohio Edison Co.*,
   276 F. Supp. 2d 829 (S.D. Ohio 2003) ..............................................................28

*United States v. Pozsgai*,
   999 F.2d 719 (3d Cir. 1993) .............................................................................47

*United States v. Westvaco Corp.*,
   144 F. Supp. 2d 439 (D. Md. 2001)...................................................................25

*Wis. Elec. Power Co. v. Reilly*,
   893 F.2d 901 (7th Cir. 1990) ...............................................................................7

## STATUTES

Air Pollution Control Act, 35 P.S. §§ 4001-4015............................................10, 11

Clean Air Act, 42 U.S.C. §§ 7401-7671q .......................................................*passim*

7 U.S.C. § 4509 ..................................................................................................43

28 U.S.C. § 2462 .......................................................................................*passim*

33 U.S.C. § 1311 .................................................................................................27

25 Pa. Code § 121.1 ..............................................................................................9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

25 Pa. Code §§ 127.1-.802.................................................................1

25 Pa. Code § 127.11 ........................................................11, 18, 39

25 Pa. Code § 127.11, *et seq.* .........................................11, 12, 38

25 Pa. Code § 127.12 .....................................................................38

25 Pa. Code § 127.12b ...................................................................11

25 Pa. Code § 127.21 ........................................................18, 38, 39

25 Pa. Code § 127.25 ...............................................................11, 38

25 Pa. Code § 127.81, *et seq.* ...................................................33, 38

25 Pa. Code § 127.83 ......................................................................6

25 Pa. Code §§ 127.401-127.463 ..................................................11

25 Pa. Code § 127.402 ...................................................................12

25 Pa. Code § 127.441 ...................................................................12

25 Pa. Code § 127.443 .............................................12, 18, 38, 39

25 Pa. Code § 127.444 ...................................................................12

25 Pa. Code § 127.445 ...................................................................39

25 Pa. Code § 127.503 .....................................................................8

25 Pa. Code § 127.542 ...................................................................53

25 Pa. Code § 127.543 ...................................................................53

42 U.S.C. § 6925...........................................................................27

42 U.S.C. § 7409.............................................................................6

42 U.S.C. § 7410.............................................................................6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

42 U.S.C. § 7411 ................................................................................7, 23

42 U.S.C. § 7413 .................................................................................*passim*

42 U.S.C. § 7414 ....................................................................................46

42 U.S.C. §§ 7470-7492 ...........................................................................6

42 U.S.C. § 7475 .................................................................................*passim*

42 U.S.C. § 7477 ........................................................................9, 22, 23, 46

42 U.S.C. § 7479 .........................................................................7, 29, 34, 36

42 U.S.C. § 7602 ..................................................................................29, 34

42 U.S.C. § 7604 .............................................................................10, 44, 56

42 U.S.C. § 7661a ...............................................................................*passim*

42 U.S.C. § 7661b ..............................................................................23, 51

42 U.S.C. § 7661c ...............................................................................*passim*

42 U.S.C. § 7661d ..............................................................................23, 53

42 U.S.C. § 7661e ...................................................................................23

42 U.S.C. § 7661f ....................................................................................23

35 P.S. § 4006.1 ......................................................................................11

## OTHER AUTHORITIES

40 C.F.R. pt. 50 ........................................................................................6

40 C.F.R. § 51.166 ..................................................................................47

40 C.F.R. § 52.21 ................................................................................*passim*

40 C.F.R. § 52.2058 .................................................................................6

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

40 C.F.R. § 70.1 ................................................................................9, 50

40 C.F.R. § 70.2 ......................................................................................50

40 C.F.R. § 70.7 ......................................................................................53

40 C.F.R. § 70.8 ......................................................................................53

40 C.F.R. § 761.3 ....................................................................................27

57 Fed. Reg. 32,325 (July 21, 1992)......................................................37

Black's Law Dictionary 1432 (6th ed. 1990) .........................................43

Don Hopey, *Homer City Power Plant Pollution Controls Approved*, Pitt.
    Post-Gazette, April 2, 2012, *available at* http://www.post-gazette. com/
    stories/local/breaking/homer-city-power-plant-pollution-controls-
    approved-629583/ ..............................................................................16

H.R. Rep. No. 101-490(I) (1990) *reprinted in* 1990 WL 258792 ..........23

Kathy Mellot, *State goes to bat for power plant*, The Tribune-Democrat
    (Sept. 18, 2012), *available at* http://tribune-democrat.com/local/
    x72191550/State-goes-to-bat-for-power-plant ...................................47

New Oxford American Dictionary 1689 (2d ed. 2005)...........................43

Opening Brief, *United States v. Midwest Generation LLC*,
    No. 09-cv-5277 (N.D. Ill.), Docket No. 45 at 17................................48

S. Rep. No. 101-228 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385 .....................22

Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e).......................................40

# TABLE OF ABBREVIATIONS

### *Parties*

| | |
|---|---|
| EME | EME Homer City Generation, L.P. |
| The Government | Collectively, the plaintiffs-appellants |
| NYSEG | New York State Electric & Gas Company |
| The OLs | Homer City OL1, LLC; Homer City OL2, LLC; Homer City OL3, LLC; Homer City OL4, LLC; Homer City OL5, LLC; Homer City OL6, LLC; Homer City OL7, LLC; and Homer City OL8, LLC |
| PADEP | Pennsylvania Department of Environmental Protection |
| Penelec | Pennsylvania Electric Company |
| The States | PADEP, New York, and New Jersey |
| EPA | United States Environmental Protection Agency |

### *Defined Terms*

| | |
|---|---|
| A.__ | The Joint Appendix at page __ |
| APCA | The Pennsylvania Air Pollution Control Act |
| BACT | Best Available Control Technology |
| CAA | The Clean Air Act, 42 U.S.C. §§ 7401-7671q |
| NAAQS | National Ambient Air Quality Standards |
| NSR | New Source Review Program |
| NSPS | New Source Performance Standard |
| PSD | Prevention of Significant Deterioration |
| R.__ | District Court docket entry No. __ |

**TABLE OF ABBREVIATIONS**
(continued)

**Page(s)**

| | | |
|---|---|---|
| SIP | State Implementation Plan | |
| St.Br.__ | Opening Brief of the States at page __ | |
| The Plant | The Homer City Plant | |
| The Units | Units 1 and 2 of the Homer City Plant | |
| U.S.Br.__ | Opening Brief of the United States at page __ | |

## JURISDICTIONAL STATEMENT

The jurisdictional statement of the United States is complete and correct.

## STATEMENT OF THE ISSUES

At issue is whether the Homer City OL1-OL8, LLCs (the "OLs") and EME Homer City Generation, L.P. ("EME"), the subsequent owners and operator of an electricity-generating plant in Pennsylvania (the "Plant"), can be held liable under the Clean Air Act ("CAA"), 42 U.S.C. §§ 7401-7671q, and Pennsylvania's analog laws, 25 Pa. Code §§ 127.1-.802, for the alleged failures of the Plant's prior owners, New York State Electric & Gas Co. ("NYSEG") and Pennsylvania Electric Co. ("Penelec"), to obtain preconstruction permits before they modified the Plant over 15 years ago.  The district court ruled that EME and the OLs could not be liable.

The specific questions presented in this appeal are whether the district court correctly held that:

1.    The CAA's Prevention of Significant Deterioration ("PSD") program prohibits only the *construction* or *major modification* of a source without a permit, not the subsequent *operation* of the source, and thus EME and the OLs cannot be liable for violating that program as they did not own or operate the Plant at the time of any alleged construction or major modification;

2.    Pennsylvania state law is no different from federal law in these

respects, and likewise cannot form a basis for liability of a subsequent owner or operator who never constructed or modified the source;

3.    PSD violations are one-time violations that first accrue when construction commences and are subject to the federal five-year statute of limitations at 28 U.S.C. § 2462; and

4.    EME and the OLs cannot be held liable under Title V of the CAA for the prior owners' alleged failure to obtain a preconstruction permit because Title V is separate and distinct from the PSD program and does not create PSD requirements.

## INTRODUCTION

The complaint alleges EME operates an electricity-generating plant in Homer City, Pennsylvania.  EME acquired the Plant in 1999 from NYSEG and Penelec.  Shortly thereafter, EME sold the Plant to (and simultaneously leased it back from) the OLs.[1]  The Plant generates electricity for hundreds of thousands of customers in Pennsylvania and beyond.

The United States, later joined by Intervenor-Plaintiffs the Pennsylvania Department of Environmental Protection ("PADEP"), New York, and New Jersey (collectively, the "States"), sued EME, NYSEG, Penelec, and the OLs.  All the

---

[1] As of December 14, 2012, EME and the OLs no longer own or operate the Plant.  Given the allegations of the complaint and for purposes of this brief, EME and the OLs are still referred to as the owners and operators of the Plant.

plaintiffs (collectively, the "Government") asserted claims under two parts of the

Clean Air Act ("CAA"):  the "Prevention of Significant Deterioration" ("PSD")

program and the Title V operating permit program.  PADEP and New York also

brought additional, derivative state-law claims.  The core of these claims is that:

(1) prior owners NYSEG and Penelec completed "major modifications" of Units 1

and 2 at the Plant (the "Units") between 1991 and 1996—*over 15 years before the

complaints in this case were filed*—without first obtaining PSD preconstruction

permits; and (2) EME and the OLs later owned and operated the Plant pursuant to a

Title V permit that does not incorporate the PSD requirements that the Government

believes would have been in the prior owners' PSD permit, had one been issued.

The claims against EME and the OLs for the long-past conduct of prior

owners are meritless.  The Government seeks to hold EME liable for *operating*,

and the OLs liable for *acquiring*, the Units years after NYSEG and Penelec

allegedly modified them.  The PSD provisions, however, prohibit only the

*construction* (defined to include "modification") of major emitting sources without

first obtaining a *preconstruction* permit, and federal law requires that such claims

be brought within five years of when they first accrue.  *See* 42 U.S.C. § 7475; 28

U.S.C. § 2462.  The applicable regulations and state laws do the same.  That is why

the district court held, consistent with a long line of precedent, that a PSD violation

is a one-time violation that occurs *at the time of construction* and no later and is

subject to the five-year statute of limitations. (A.26.) Because the Government never alleged that EME and the OLs modified the Units, the court dismissed the PSD claims against them, along with the smattering of duplicative state-law claims asserted by the intervenors. (*Id.* at 28, 40, 41.)

The Government's arguments ignore the plain language of the CAA and its comprehensive regulatory schemes that control emissions from the Units. Instead, its briefs parade through imaginary policy horribles intended to distract this Court from the statutory text. But each of these supposed horribles would come to pass only if PADEP and the Environmental Protection Agency ("EPA") abdicated their duty to enforce the many applicable CAA programs, and if, at the same time, the federal courts ignored collusion and conspiracies that are independently prohibited by law—something that no one *even alleges* here. In reality, the only policy outcomes that will flow from enforcing the actual statutory language are that (1) regulators will have to sue timely those who actually violate the PSD provisions when they attempt to construct without a permit, as opposed to suing whoever happens to own or operate a source many years later, and (2) only actual wrongdoers, not innocent subsequent purchasers, will face draconian liability under the CAA. For these reasons, the district court's judgment should be affirmed in its entirety.

## STATEMENT OF THE CASE

On January 6, 2011, the United States filed this lawsuit against EME and the OLs.  (R.1.)  The United States' complaint asserted (1) violations of the CAA's PSD provisions and (2) derivative claims under Title V, the CAA's operating permit provisions.  (*Id.*)  On January 6, 2011, PADEP and the State of New York sought leave to intervene (R.2), which was granted on January 7, 2011.  (R.8.) These States asserted duplicative PSD and Title V claims, as well as claims that EME and the OLs violated Pennsylvania's state plan approval and operating permit requirements.  (R.10.)  PADEP also asserted a claim for public nuisance under Pennsylvania state law.  (*Id.*)  Finally, on February 10, 2011, the State of New Jersey sought leave to intervene (R.39), which was granted on February 11, 2011. (R.41.)  New Jersey's complaint likewise asserted violations of the CAA's PSD provisions and derivative claims under Title V.  (R.47.)

On October 12, 2011, the district court granted the motions of EME, the OLs, and their co-defendants, and dismissed all claims in the case.  (R.111.)  The United States filed its notice of appeal on December 8, 2011 (R.112), and the States, theirs on December 9, 2011.  (R.113, 114.)

## STATEMENT OF FACTS

### A.    The Clean Air Act Framework.

The CAA creates a federal/state partnership to attain and maintain clean air. EPA has promulgated National Ambient Air Quality Standards ("NAAQS") under

the CAA for six pollutants:  ground-level ozone, lead, sulfur dioxide, carbon monoxide, nitrogen dioxide, and particulate matter.  42 U.S.C. § 7409; *see generally* 40 C.F.R. pt. 50.  Under the CAA, EPA determines whether areas of a state comply with the NAAQS for those pollutants.

The CAA then directs the states to adopt SIPs to achieve and maintain NAAQS.  42 U.S.C. § 7410(a).  These SIPs are submitted to EPA for approval.  *Id.* § 7410(a), (k).  The CAA thus vests states with primary enforcement authority, while giving EPA a secondary role.  *See Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 484-90 (2004); *Solar Turbines Inc. v. Seif*, 879 F.2d 1073, 1075 (3d Cir. 1989).  The Plant, which EME acquired from NYSEG and Penelec in 1999, falls within the regulatory jurisdiction of PADEP.

### 1.    The CAA's PSD Program.

One mechanism through which the CAA directs states to attain and maintain NAAQS is the New Source Review ("NSR") program.  NSR includes a component called PSD, which addresses the impact of major sources on ambient air quality in areas that have attained NAAQS.  42 U.S.C. §§ 7470-7492.  The SIP incorporates the federal PSD regulations at 40 C.F.R. § 52.21.[2]  *See* 40 C.F.R. § 52.2058; 25 Pa. Code § 127.83.

---

[2] These regulations have changed over time.  The relevant regulations applicable in Pennsylvania during the time of the alleged modifications were filed below (R.86-1) and are attached as Exhibit A.

When adopting the CAA, "Congress chose not to subject existing plants" to the PSD requirements. *Wis. Elec. Power Co. v. Reilly*, 893 F.2d 901, 909 (7th Cir. 1990). Accordingly, existing sources are not subject to PSD requirements unless and until they undergo a major "modification" that will result in a significant net emissions increase of a regulated PSD pollutant. The Pennsylvania SIP thus states that "any owner or operator of a source or modification subject to this section who commences construction . . . without applying for and receiving [a PSD preconstruction permit], shall be subject to appropriate enforcement action." 40 C.F.R. § 52.21(r)(1) (implementing 42 U.S.C. § 7475(a) ("[n]o major emitting facility . . . may be constructed" or modified without satisfying conditions)); *see also* 42 U.S.C. § 7479(2)(C) ("'construction'" includes "modification" as defined at 42 U.S.C. § 7411(a)).

When determining whether a project triggers PSD permitting, an owner or operator's duty "is not prescience, but merely a reasonable estimate of the amount of additional emissions that the change will cause." (A.15-16 (quoting *United States v. Cinergy Corp.*, 458 F.3d 705, 709 (7th Cir. 2006)).) The applicable regulations provide limited guidance and "it may be a very difficult estimate to make." *Cinergy*, 458 F.3d at 709.

An owner or operator who proposes to construct or modify an emissions unit that triggers PSD must (1) obtain a preconstruction permit containing BACT

emissions limits for each regulated pollutant, which limits are determined through

the construction permitting process for that specific emissions unit; and (2) conduct

preconstruction "monitoring as may be necessary to determine the effect which

emissions" attributable to the modification would have on ambient air quality. 42

U.S.C. § 7475(a); 40 C.F.R. § 52.21(j)-(r). If, on the other hand, as the district

court explained,

> the operator determines (rightly or wrongly) that a pre-construction
> PSD permit is not necessary for a particular modification of the plant,
> no specific action is required on anyone's part—the operator simply
> continues to run the plant as usual. The statutory and regulatory
> mechanisms for implementing pollution controls are not triggered.

(A.20.) Thus, if "[t]he process to determine BACT case-by-case at the facility

does not occur," "[n]o pre-construction permit is issued by which operating

conditions may be established or later incorporated into a Title V permit." *Id.*

### 2.    The CAA's Title V Provisions.

Unlike the PSD provisions (which deal with construction), Title V of the

CAA deals with operation and requires that a source's owner or operator (1) obtain

an operating permit consolidating all legal requirements to which it is subject and

(2) operate in accordance with that permit's terms. To obtain this permit, a

source's owner or operator must submit an application that, among other things,

addresses the "applicable requirements" for the source. 25 Pa. Code § 127.503.

The Pennsylvania Code defines "applicable requirements" to include "[a] term or

-8-

condition of preconstruction permits issued" under, among other things, the PSD provisions.  25 Pa. Code § 121.1.

Thus, if BACT limits have been established in a PSD preconstruction permit, those limits are listed in the Title V operating permit and are enforceable on an ongoing basis through that operating permit.  42 U.S.C. § 7661c(a).  But as the federal regulations make clear, "[T]itle V does not impose substantive new requirements."  40 C.F.R. § 70.1(b).  Nor does Title V require inapplicable requirements to be listed or followed.  *Sierra Club v. EPA*, 551 F.3d 1019, 1023 (D.C. Cir. 2008).  Accordingly, if no PSD permit ever issued, then no BACT limits were determined, and as a result there are no PSD requirements to include in a Title V permit.  The prior owners applied for a Title V permit in 1995.  PADEP issued the Title V permit in 2004 after nine years of review.

### 3.    The CAA's Enforcement Provisions.

Should an owner or operator fail to obtain a preconstruction permit when required to do so by the CAA and Pennsylvania SIP, there is a specific mechanism for enforcement against that owner or operator at the time PSD obligations are triggered.  The CAA provides that "[t]he Administrator shall, and a State may, take such measures, including . . . seeking injunctive relief, as necessary to prevent the construction or modification of a major emitting facility which does not conform to the requirements of this part[.]"  42 U.S.C. § 7477.  The Government did not

invoke this PSD-specific enforcement provision.  Instead, it waited roughly 15

years after the last alleged modification occurred to file its suit.  The United States

relied on CAA's general enforcement provision, 42 U.S.C. § 7413.  That provision

authorizes the "Administrator" to enforce the CAA by commencing "a civil action

for a permanent or temporary injunction, or to assess and recover a civil

penalty . . . , or both," against a "person that is the owner or operator" of "a major

emitting facility . . . [w]henever such person has violated, or is in violation of, any

requirement or prohibition of an applicable [SIP] or permit."  *Id.* § 7413(b)(1); *see

also id.* § 7413(b)(2) ("[w]henever such person has violated . . . any other

requirement or prohibition of this subchapter").[3]  Claims for civil penalties under

the CAA are governed by the general five-year statute of limitations.  Thus, CAA

civil penalty claims must be "commenced within five years from the date when the

claim first accrued . . . ."  28 U.S.C. § 2462.

### 4. Pennsylvania's Plan Approval And Operating Requirements.

Pennsylvania's analogue to the CAA—the Air Pollution Control Act

("APCA"), 35 P.S. §§ 4001-4015—similarly provides that "[n]o person shall

construct, assemble, install or modify any stationary air contamination source . . .

unless such person has applied to and received written plan approval from

---

[3] The States' CAA claims were brought under analogous citizen-suit provisions of 42 U.S.C. § 7604.

[PADEP] to do so." *Id.* § 4006.1(a). The APCA also prohibits a person from "operat[ing] any stationary air contamination source unless [PADEP] shall have issued to such person a permit to operate such source." *Id.* § 4006.1(b)(1). Pennsylvania has implemented these portions of the APCA with regulations known as "plan approval" and "operating permit" requirements. *See* 25 Pa. Code §§ 127.11-127.51; 127.401-127.463.

Like the PSD provisions, the plan approval requirements provide that "a person may not cause or permit the construction or modification of an air contamination source . . . unless the construction [or modification] has been approved by [PADEP]." *Id.* § 127.11. This approval is obtained by submitting an application to PADEP, after which PADEP issues a plan approval, which is a preconstruction permit. This plan approval contains certain requirements, including those that "[PADEP] deems necessary to assure the proper operation of the source" as well as "the emission and performance standards [of the APCA], the [CAA] or the regulations adopted under the [APCA] or the [CAA]." *Id.* § 127.12b(a) & (b). The person modifying the source must operate in compliance with the terms and conditions of that person's application and plan approval. *Id.* § 127.25. Thus, like the PSD program, Pennsylvania's Plan Approval program requires that the person who "modifies" a source (1) apply for and obtain plan

approval from PADEP before starting construction and (2) subsequently operate in compliance with the terms and conditions of the application and plan approval.

Pennsylvania's operating permit requirements, like Title V's, prohibit a person from operating a pollution source "unless [PADEP] has issued to the person a permit to operate the source . . . in response to a written application for a permit." *Id.* § 127.402(a); *see also id.* §§ 127.443(a) & 127.444. As relevant here, Pennsylvania's operating permit requirements (like Title V) incorporate other existing requirements into a single permit. Section 127.441, for example, requires that an operating permit "incorporate by reference the emission and performance standards and other requirements of the [APCA], the [CAA] or the regulations thereunder."

### B.    Proceedings And Disposition Below.

The Plant has three generating units, Homer City Units 1 through 3. (R.1 ¶ 58.) NYSEG and Penelec built the Plant in the 1960s; Penelec operated it until it was sold to EME in 1999. (*Id.* ¶¶ 2, 19.) EME then sold the Plant to, and simultaneously leased it back from, the OLs in 2001. (*Id.* ¶ 63.) The complaint alleged that the OLs are the Plant's current owners and that EME is its current operator. (*Id.* ¶¶ 2, 63; R.10 ("PA/NY Complaint") ¶ 15; R.47 ("NJ Complaint") ¶ 14.).

Between June 2008 and November 2010, the Government issued various

Notices of Violation to EME, the OLs, and the former owners and operators of the

Units, alleging that certain projects at the Units performed by the prior owners

violated PSD.  (R.1 ¶¶ 6, 68, & 79; R.10 ¶¶ 96, 103-104, 122-123; R.47 ¶¶ 70, 79-

80, 95-96.)  Finally, after EPA conducted years of one-way discovery via

administrative information requests, the United States sued on January 6, 2011,

approximately *15 years* after the last alleged modification of the Units and *over 10*

*years* after EME and the OLs acquired them.  The United States asserted in its

complaint that alleged modifications of Unit 2 in 1991 and Unit 1 in 1994 triggered

a duty to satisfy certain PSD preconstruction requirements, which NYSEG and

Penelec failed to satisfy.  (R.1 ¶¶ 69, 80.)  This, the United States contended below,

somehow gave rise to PSD claims against EME and the OLs.  (*Id.* ¶¶ 70, 81.)  The

United States also alleged that EME's and the OLs' failure to address PSD-related

requirements in their operating permits violated Title V, which contains the CAA's

operating permit provisions.  (*Id.* ¶¶ 74-76, 85-87.)

PADEP, New York, and New Jersey largely parroted the PSD and Title V

claims of the United States, though the States specifically claimed two additional

alleged modifications:  of Unit 2 in 1995 and Unit 1 in 1996.  (R.10 ¶¶ 104, 123;

R.47 ¶¶ 80, 96.)  Thus, while all of the complaints pleaded that NYSEG and

Penelec—not EME and the OLs—performed the alleged modifications, they all

nonetheless claimed that EME and the OLs somehow are responsible.  In addition,

the PA/NY complaint lodged two other claims.  First, PADEP and New York

assert that the same modifications at issue in their PSD claims also violated

Pennsylvania's plan approval and operating permit requirements.  (R.10 ¶ 141.)

Second, PADEP makes the derivative claim that EME's and the OLs' alleged

violations of Pennsylvania environmental laws constitute a public nuisance.  (*Id.* ¶

171.)  EME and the OLs moved to dismiss these complaints in their entirety.

The district court granted these motions, ruling that "[t]he PSD requirements

are forward-looking and framed in terms of that which utilities must do *before*

commencing construction."  (A.15 (emphasis added).).  Therefore, "[a] PSD

violation occurs, at the latest, at the time of the construction project."  (A.23.)

"[T]he alleged PSD violations constitute singular, separate failures by the Former

Owners to obtain pre-construction permits, rather than ongoing failures to comply

with whatever hypothetical conditions might have been imposed during the PSD

permitting process."  (A.26.)  "Because the projects at issue in this case occurred

15–20 years ago and no enforcement action was taken until 2008, the limitations

period has long since expired."  (*Id.*)  Hence, the district court dismissed the

Government's claims for civil penalties under the PSD provisions.  (*Id.*)  For that

same reason, EME and the OLs "could not possibly have applied for a PSD pre-

construction permit for the 1991, 1994, 1995 or 1996 modification projects

because [they] had no connection to the Plant or the Former Owners at that time,"

thus likewise making injunctive relief against EME and the OLs under the PSD provisions improper.  (A.27.)

The district court also dismissed the Title V claims in their entirety.  As it explained, "the Clean Air Act does not incorporate PSD requirements into Title V permits, but instead carefully distinguishes violations of permits issued under the Title V 'subchapter' from violations of preconstruction permits obtained under the PSD program."  (A.36.)  Because "[a] Title V permit application was, in fact, submitted and a facially valid Title V permit was, in fact, duly issued in 2004 for operation of the Plant," the court held that the Government's Title V claims were likewise meritless.  (*Id.*)[4]

The district court then addressed and dismissed the States' various claims under Pennsylvania law.  "[T]he PA SIP is identical to the federal PSD program in all respects."  (A.38.)  There too, "[w]here the pre-construction permitting process is never triggered, the plan approval and conditions that hypothetically might have been created during that process never materialize, and therefore, are not incorporated into the operating permit."  (A.38-39.)  Thus, "the Court conclude[d] that the claims under the APCA and Pennsylvania SIP are duplicative of the federal Clean Air Act claims and must be dismissed."  (A.40.)

---

[4] The court also found that the Government had "not alleged any affirmative condition in the Title V permit which is being violated."  (A.34.)

Finally, the district court dismissed Pennsylvania's public nuisance claim

(A.35-36), a decision that PADEP does not challenge on appeal. *See* St.Br.25 n.7.[5]

## SUMMARY OF ARGUMENT

The plain language of both the CAA and the Pennsylvania SIP defeats the

Government's claims that EME and the OLs violated PSD and Title V. The

majority of circuits to consider similar claims—as well as district courts across the

country—have come to the same conclusion as the district court did here. The

Government tries mightily to avoid that precedent by conjuring all manner of

alleged policy consequences (most of them extra-record). Its efforts fail.

EME and the OLs did not violate the CAA's PSD provisions because those

provisions establish "preconstruction" permit obligations only. These provisions,

as implemented through the Pennsylvania SIP, prohibit constructing or modifying

a source without a PSD permit. The statutory section the Government invokes, 42

U.S.C. § 7475, is entitled "Preconstruction Requirements," and nowhere imposes

liability on owners or operators who later acquire (like EME and the OLs) and then

operate (like EME) a plant at which a prior owner allegedly made unpermitted

modifications. The applicable regulations are no different. All speak solely in

---

[5] On April 2, 2012, after the district court's disposition of the case, PADEP issued the Plant a plan approval to install state-of-the-art scrubbers at Units 1 and 2. These scrubbers will reduce sulfur dioxide emissions at the Plant by 84 percent. *See* Don Hopey, *Homer City Power Plant Pollution Controls Approved*, Pitt. Post-Gazette, April 2, 2012, *available at* http://www.post-gazette.com/stories/local/ breaking/homer-city-power-plant-pollution-controls-approved-629583/.

terms of *beginning* construction, *e.g.*, 40 C.F.R. § 52.21(i)(1), and all impose obligations on *only* constructing or modifying.

This straightforward interpretation of the CAA and Pennsylvania SIP makes sense. For instance, the Government entirely skips over the predicate question of whether Penelec's and NYSEG's alleged "modifications" would have required a PSD preconstruction permit in the first place. That question is subject to amorphous standards, raises numerous technical issues, and is typically hotly contested. *See, e.g.*, *Cinergy Corp.*, 458 F.3d at 709. These technical inquiries require fact-intensive, unit-specific, future emission projections based on information known to the owner or operator at the time of the project. *Id*. It therefore makes no sense to hold subsequent owners and operators responsible for the decision to modify without a PSD permit. It is *that* modification decision which potentially creates CAA liability, and thus only *that* "decider" is accountable.

On the statutory text, the Government provides a lengthy discussion, but only rarely (and selectively) quotes the relevant provisions, in addition to relying on a number of false assumptions. For example, the Government repeatedly insists that the Units are "subject to" BACT. But it fails to address the fact that BACT does not exist in the abstract, does not embody some free-standing obligation, and is, in fact, determined only as part of the preconstruction permitting process. *See*

40 C.F.R. § 52.21(b)(12) (BACT is crafted "on a case-by-case basis" as part of that process). The Government also invokes 25 Pa. Code § 127.21 (now 25 Pa. Code § 127.443(a)), a state SIP provision that it claims requires subsequent owners to retroactively acquire a PSD permit. But § 127.21 refers to Pennsylvania "plan approval" requirements, not PSD requirements. *See* 25 Pa. Code § 127.11. So even if EME and the OLs had violated § 127.443—which they did not—that could neither give rise to PSD liability nor impose any BACT obligations. The other provisions the Government invokes are equally inapposite.

Since neither EME nor the OLs violated the CAA, the statute precludes the Government's attempts to penalize them. The CAA's enforcement provision, 42 U.S.C. § 7413(b)(1), makes clear that the Government may enforce against a "person" only if "such person" has violated the Act. Unlike other environmental statutes, culpable conduct is a central principle in the CAA. And because neither EME nor the OLs violated the PSD provisions, neither is culpable and neither can be subject to CAA penalties.

The Government also presses myriad flawed policy rationales for rewriting the CAA and Pennsylvania SIP. The Government claims that the district court's interpretation of the PSD preconstruction requirements imposes "laughably" inadequate penalties to deter violations. But that claim ignores that violators may be subject "'to injunctive remedies that can include shutting down the new

construction or requiring extensive (and expensive) modifications'"—hardly a

"'cost-free decision.'"  *United States v. Midwest Generation, LLP*, 694 F. Supp. 2d

999, 1008 (N.D. Ill. 2010) (quotation omitted).  It also ignores that the CAA

imposes *criminal* penalties on individuals or companies who "knowingly" violate

its provisions.  *See* 42 U.S.C. § 7413(c)(1).  And if needed, there are many ways

that the Government can impose comparable or even stricter emissions standards

on existing sources (*e.g.,* revise Pennsylvania's SIP), regardless of whether their

prior owners obtained PSD permits.

Besides, the Government (unlike EME and the OLs) had all the tools it

needed to address the alleged modifications of the Units by enforcing timely

*against the alleged modifier*.  But instead, the Government sat on its hands for over

a decade before suddenly asking the district court to spring quasi-criminal liability

on EME and the OLs for doing nothing more than purchasing and operating the

Units.  Nothing in law or policy requires this Court to rewrite the CAA to save the

Government from its own delay.

The Government's Title V claims likewise fail.  Those claims are wholly

derivative of the Government's PSD claims.  Title V does not itself create

substantive requirements like BACT; it merely requires that an owner or operator

obtain an operating permit that reflects applicable legal requirements (including

any PSD-related requirements) and operate in accordance with that permit.

Moreover, Title V makes clear that there can *never* be Title V liability where—as here—the Units are operated in accord with the limitations that are actually specified in the issued Title V permits.  The Government seeks to rewrite the statute to avoid this reality.  Here too, its revisionism fails.  The district court's judgment should be affirmed.

## ARGUMENT

I.  **THE CAA'S PSD PROVISIONS ESTABLISH PRECONSTRUCTION PERMIT OBLIGATIONS ONLY, SUBJECT TO A FIVE-YEAR STATUTE OF LIMITATIONS.**

The CAA's PSD provisions, as incorporated into the Pennsylvania SIP, prohibit constructing or modifying a plant without a PSD permit.  They do not impose liability for later acquiring and operating a plant with unpermitted modifications.  Here, the Government alleges that "[b]efore selling the plant to Homer City, Penelec and NYSEG modified it in ways that triggered Clean Air Act permitting and pollution control requirements."  (U.S.Br.2-3.)  That concession is fatal to the Government's claims against EME and the OLs.

A.  **The Plain Language Of The PSD Provisions Prohibits Only The Act Of Construction Without A Permit And Not Subsequent Ownership Or Operation.**

The Supreme Court and this Court have repeatedly admonished that, when a "'statute's language is plain,'" courts must "'enforce it according to its terms.'" *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (internal citation omitted); *Cheng v. Attorney General*, 623 F.3d 175, 186 (3d Cir. 2010).  So too for administrative

-20-

regulations.  *Sec'y of Labor v. Beverly Healthcare-Hillview*, 541 F.3d 193, 197-98

(3d Cir. 2008).  Here, the plain meaning defeats the Government's claims.

Section 7475, which sets forth the PSD requirements incorporated into the

Pennsylvania SIP, is entitled "Preconstruction Requirements."  That provision

establishes requirements that an owner or operator of the facility must satisfy

*before* beginning to construct or modify.  It provides:

> No major emitting facility . . . may *be constructed* in any area to which this
> part applies *unless*—
>
> (1) *a permit has been issued* for such proposed facility in accordance with
> this part setting forth emission limitations for such facility which conform to
> the requirements of this part;
>
> (2) the *proposed permit has been subject to a review* in accordance with this
> section, . . .
>
> (3) the *owner or operator of such facility demonstrates* . . . that emissions
> from construction or operation of such facility *will not* cause, or contribute
> to, air pollution in excess of . . .
>
>> (C) any other applicable emission standard or standard of performance
>> under this chapter;
>
> (4) the proposed facility *is subject* to the best available control technology
> for each pollutant subject to regulation under this chapter . . .
>
> (7) the person who owns or operates, or proposes to own or operate, a major
> emitting facility for which a permit is required under this part *agrees to*
> *conduct* such monitoring as may be necessary to determine the effect which
> emissions from any such facility may have . . . .

42 U.S.C. § 7475(a)(1)-(4), (7) (emphases added).  Section 7475 is thus phrased as

a prohibition against *constructing* without first satisfying various preconditions.

So the district court correctly observed that a "PSD violation occurs, at the latest, at the time of the construction project." (A.23); *accord Sierra Club v. Franklin County Power of Ill., LLC*, 546 F.3d 918, 928 (7th Cir. 2008) ("[T]he *last* possible moment at which a [PSD preconstruction] violation occurs is 'when the actual construction is commenced, and not at some later point in time.'") (internal citation omitted).

The regulations in effect at the time Penelec and NYSEG made the alleged modifications confirm this. They provide: "No stationary source or modification to which the requirements of paragraphs (j) through (r) of this section apply *shall begin actual construction without a permit . . . .*" 40 C.F.R. § 52.21(i)(1) (emphasis added). The CAA enforcement provision for PSD violations underscores this: To enforce the PSD preconstruction requirements, EPA may "take such measures . . . as necessary to prevent the *construction or modification*" of a source subject to PSD. 42 U.S.C. § 7477 (emphasis added). Nothing in these provisions proscribes—or gives the Government any enforcement authority regarding—the operation of a plant without a required preconstruction permit.

This distinction is also clear in the legislative history. In 1990, Congress rejected an amendment to 42 U.S.C. § 7477 that would have added "the terms 'operation' and 'modification' to the term 'construction of a major emitting facility.'" S. Rep. No. 101-228, at 376 (1989), *reprinted in* 1990 U.S.C.C.A.N.

-22-

3385, 3759. Instead, Congress adopted an amendment that added the term "modification" but *not* the term "operation." H.R. Rep. No. 101-490(I) (1990), *reprinted in* 1990 WL 258792, at *178. Congress's decision to exclude the word "operation" from § 7477 further demonstrates its intent to limit PSD requirements to construction activities.

It makes sense that the PSD preconstruction provisions create obligations that are preconstruction only. An entirely separate panoply of CAA provisions— none at issue here—address the need to obtain operating permits. *Compare* 42 U.S.C. § 7475(a)(1) (preconstruction permits), *with* §§ 7661-7661f (operating permits). These provisions expressly distinguish between *operating* permits and *preconstruction* permits. *See, e.g.*, 42 U.S.C. § 7661a(a) ("Nothing in [the CAA's operating-permit provisions] shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification."). And unlike the preconstruction permit provisions, the operating permit provisions *do* make it "unlawful" to "*operate* a major source . . . *except in compliance* with a permit issued by a permitting authority under *this subchapter*." *Id.* (emphases added).[6] This specific inclusion of an enforcement provision for operating

---

[6] Congress has also prohibited "operation" in violation of an applicable New Source Performance Standard ("NSPS"). *See* 42 U.S.C. § 7411(e). Thus, Congress clearly knew how to prohibit operation of a "modified" source when it wanted to—something it did not do in the PSD program. *See, e.g.*, *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008, 1014 (8th Cir. 2010).

violations in § 7661a—as contrasted with the lack of such a provision in § 7475—

further confirms that PSD preconstruction permit violations under § 7475 occur

only at the time of construction.  *See, e.g.*, *Barnhart v. Sigmon Coal Co.*, 534 U.S.

438, 452 (2002) (where "'Congress includes particular language in one section of a

statute but omits it in another section of the same Act, it is generally presumed that

Congress acts intentionally and purposely'").

     The vast majority of courts to have addressed the issue—including two

Courts of Appeals—agree that these PSD requirements are violated only by

unpermitted construction, not by subsequent operation.  The Eleventh Circuit was

the first in *National Parks & Conservation Association, Inc. v. Tennessee Valley*

*Authority*, 502 F.3d 1316, 1322 (11th Cir. 2007) ("*TVA 11th Cir.*").  "From this

language," the court reasoned, "it follows that violations of the preconstruction

permitting requirements occur at the time of construction, not on a continuing

basis."  *Id.* (quotation omitted).  The Eighth Circuit likewise held that the statutory

language "unambiguously indicates that the PSD requirements are conditions of

construction, not operation."  *Sierra Club v. Otter Tail Power Co.*, 615 F.3d 1008,

1014 (8th Cir. 2010).  This interpretation is further bolstered by a "long line of

district court cases."  *CleanCOALition v. TXU Power*, 536 F.3d 469, 478 (5th Cir.

2008) (collecting cases); *United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 957

(S.D. Ill. 2003) ("[T]he plain language of the [PSD] provisions demonstrates that

-24-

any preconstruction violation occurs when the actual construction is commenced, and not at some later point in time.").[7]

Indeed, the only Court of Appeals to hold otherwise did so based on the language of a unique and inapposite Tennessee SIP provision that, by its terms, imposed a continuing obligation to obtain appropriate construction permits, even after commencing construction without such a permit. *See Nat'l Parks Conservation Ass'n v. Tenn. Valley Auth.*, 480 F.3d 410, 413, 419 (6th Cir. 2007) ("*TVA 6th Cir.*") (Tennessee SIP provision provided if "a source or modification was constructed *without first obtaining* a construction permit" then "a construction permit *may be issued* to the source or modification to establish . . . the necessary emission limits and requirements" (quoting Tenn. Comp. R. & Regs. § 1200-03-09-.01(1)(e) (emphases added)).) There is no comparable provision imposing an ongoing duty to obtain a PSD permit in the Pennsylvania SIP.

---

[7]*See also, e.g.*, *United States v. Midwest Generation, LLP*, 694 F. Supp. 2d 999 (N.D. Ill. 2010) (same); *Sierra Club v. Otter Tail Corp.*, 608 F. Supp. 2d 1120 (D.S.D. 2009) (same); *Commonwealth v. Allegheny Energy Inc.*, No. 2:05-cv-885, 2006 WL 1520650 (W.D. Pa. May 30, 2006) (adopting magistrate report and recommendation), *Commonwealth v. Allegheny Energy Inc.*, No. Civ.A. 05-885, 2006 WL 1509061, at *4 (W.D. Pa. Apr. 19, 2006) (same)); *New York v. Am. Elec. Power Serv. Corp.*, Nos. 2:04 cv 1098, 2:05 cv 360, 2006 WL 1331543, at *7 (S.D. Ohio Mar. 21, 2006) (same); *United States v. Cinergy Corp.*, 397 F. Supp. 2d 1025, 1030 (S.D. Ind. 2005) (same); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003) (same); *United States v. Westvaco Corp.*, 144 F. Supp. 2d 439, 444 (D. Md. 2001) (same); *United States v. Brotech Corp.*, No. Civ.A. 00-2428, 2000 WL 1368023, at *3 (E.D. Pa. Sept. 19, 2000) (same).

The rest of the Government's authorities are irrelevant.  The Government repeatedly cites the Fifth Circuit's decision in *United States v. Marine Shale Processors*, 81 F.3d 1329 (5th Cir. 1996), (U.S.Br.33, 38; St.Br.37), but that case addressed "minor source" violations, which are not subject to the PSD preconstruction program.  *See* 42 U.S.C. § 7475(a) (PSD program applies to only "major" sources).  With respect to PSD violations, the Fifth Circuit has more recently made clear that because "the preconstruction requirements," such as "evidence that the facility will utilize [BACT], are preconditions for *granting* a preconstruction permit," "'violations of the preconstruction permitting requirements occur at the time of construction.'"  *CleanCOALition*, 536 F.3d at 477, 478 (quoting *TVA 11th Cir.*, 502 F.3d at 1322, and noting it "follow[ed] a long line of district court[s]").[8]  The Government's remaining cases are not even CAA cases.  (U.S.Br.37; St.Br.39-40.)  They all involve distinguishable statutes like the Clean Water Act and the Toxic Substances Control Act, which unlike the CAA, *expressly* impose *continuing* obligations and thus prohibit *continuing*

---

[8] Moreover, *Marine Shale* has been roundly criticized, as "[i]t is not clear whether the government charged Marine Shale with violating the relevant construction permit requirements or the operation permit requirements or both, a distinction that is crucial in determining the continuing nature of the violation." *United States v. Murphy Oil*, 143 F. Supp. 2d 1054, 1083 (W.D. Wis. 2001); s*ee also Brotech Corp.*, 2000 WL 1368023, at *3  (finding *Marine Shale* "inapposite" in the context of PSD permits); *Niagara Mohawk Power Corp.*, 263 F. Supp. 2d at 662 n.20 (same).

violations.[9]

It is undisputed that EME and the OLs did not perform any of the alleged modifications. None of the PSD provisions forbids operating or acquiring a source without a preconstruction permit, and it is impossible to violate the terms of a preconstruction permit that has never been issued. EME and the OLs thus have never violated the PSD provisions.

Concluding that EME and the OLs are not CAA violators is entirely reasonable. For a subsequent owner, determining whether prior owners failed to obtain a required PSD permit is hardly "'cut and dry' and indisputable (as it may be when applied to new construction)." (A.22.) Indeed, "in the factual scenarios described in many of the reported cases which involve grandfathered facilities, such is seldom the case." (*Id.*) Rather, "the power plant operators often vigorously contest their alleged PSD liability and assert that they were *not* required to obtain a PSD permit because, *inter alia*, the projects constituted 'routine maintenance, repair and replacement' or were forecasted to not result in significant increases in emissions." (*Id.*) (emphasis altered). "It is often unclear, even in retrospect, whether the operators or the government regulators are correct." (*Id.*)

There is thus "a principled and logical basis for distinguishing between the

---

[9] *See Carr v. Alta Verde Indus., Inc.*, 931 F.2d 1055, 1058 (5th Cir. 1991) (citing 33 U.S.C. § 1311(a)); *Newell Recycling Co. v. U.S. EPA*, 231 F.3d 204, 208 (5th Cir. 2000) (citing 40 C.F.R. § 761.3)); *Harmon Indus., Inc. v. Browner*, 19 F. Supp. 2d 988, 998 (W.D. Mo. 1998) (citing 42 U.S.C. § 6925(a)).

original decision to not obtain a permit and subsequent operations." (*Id.*)  If the Government believes that an "operator wrongly failed to obtain a PSD pre-construction permit, it is *that* decision—rather than post-project operations based on the *assumption* that no permit was needed—that is sensibly subject to post-hoc, retrospective challenge." (*Id.*) (second emphasis added); *see also, e.g.*, *United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 832 (S.D. Ohio 2003) (noting that various administrations have repeatedly failed to address the fundamental issue of "at what point plants built before 1970 must comply with new air pollution standards").  Because the Government's "assumption" that a PSD permit was required for an alleged modification is invariably contentious, "at least in the context of grandfathered, operating facilities that have changed ownership, it is reasonable to construe § 7475(a) in accordance with its plain text as being directed to the initial decision of whether or not to obtain a preconstruction PSD permit." (A.22-23.)  EME and the OLs cannot properly defend the merits of complex applicability determinations that Penelec and NYSEG are alleged to have made nearly two decades ago.  The CAA recognizes this practical reality.

## B.    The Government's Contrary Contentions Are Meritless.

Contrary to the statutory language of the CAA and the Pennsylvania SIP, the supporting legislative history, and the great weight of precedent, the Government grasps for any provision of law that it can argue creates liability for operating,

rather that constructing, without a PSD permit.  The effort is in vain.

  1.  **BACT Is Part Of The Preconstruction Permitting Process Only, Does Not Exist In The Abstract, And Does Not Impose A Free-Standing Obligation.**

The Government's principal argument is that the obligation to apply BACT exists independent of the PSD permitting process, arises automatically whenever anyone modifies a source, and can be violated with or without a preconstruction permit.  Or, in the Government's words, there is a BACT "pollution control obligation" that exists independent of the construction or modification process.  (U.S.Br.20-21.)  The Government cites no cases to support its view that the "structurally co-equal" nature of § 7475's subsections imposes an independent BACT duty.  None exist.  Indeed, the Government demonstrates only its fundamental misunderstanding of BACT.

*First*, the Government enlists a *definitional* provision to support its claim that BACT applies on a "continuous basis."  It cites 42 U.S.C. § 7479(3) for the proposition that BACT is an "emissions limitation," and then states that § 7602(k) "applies" emissions limitations "on a continuous basis."  (U.S.Br.21-22.)  This is inaccurate.  Section 7602(k), titled "Definitions," says only that an "emissions limitation" *includes*, among other things, pollution control requirements that operate continuously.  This definitional provision says nothing about when or how BACT is determined or applied.

*Second*, the Government misapprehends both the structure and text of § 7475, the substantive provision at issue.  It states that a modified source is always "subject to" BACT, even if no preconstruction permit is obtained.  (U.S.Br. 24.)  But here, context is everything.  In full, that provision creates preconstruction requirements (including applying BACT) that are addressed *in a preconstruction permit*.  The opening clause of the statute states that  "[n]o major emitting facility . . . *may be constructed . . . unless*" a series of things is done, including showing that "the *proposed facility* is subject to the best available control technology for each pollutant subject to regulation under this chapter[.]"  42 U.S.C. § 7475(a)(4) (emphases added).  This language says nothing about operating a constructed (or modified) facility for which BACT was never determined, imposes no obligations after the facility is "constructed," and makes doubly clear that its requirements are preconstruction-only by referring solely to "proposed" facilities—that is, facilities which have *not yet* been constructed or modified.

The Government also erases the phrase "may be constructed" from the statute, while altering the term "proposed facility" to the very different "any new or modified facility."  *Compare* 42 U.S.C. § 7475(a)(4) ("may be constructed . . . unless . . . the proposed facility is subject to the best available control technology"), *with* (U.S.Br.24 ("any new or modified plant is 'subject to' BACT")) (emphasis omitted)).  Obviously, switching "any new" for "proposed" would

-30-

change the statute's meaning, particularly coupled with the Government's omission of the phrase "may be constructed." But the BACT obligation cannot be so easily divorced from the preconstruction permit, as two circuits have already held: "Th[e] language unambiguously indicates that the PSD requirements are conditions of construction, not operation." *Otter Tail Power Co.*, 615 F.3d at 1014; *see also TVA 11th Cir.*, 502 F.3d at 1325 (the "obligation to install [BACT is] to be met at construction time [], and [is] not an ongoing duty").

The Government also claims that § 7475 creates a free-standing prohibition on "polluting in excess of BACT" independent of the permitting process. (U.S.Br.25-30; *see also* St.Br.37.) This is demonstrated, the Government claims, by these provisions' "organizational structure" and "verb tenses." Again, not so. Subsection (a)(1) does require newly constructed facilities to first obtain a preconstruction permit. But the point is not that *this* requirement somehow controls or subsumes the other subsections. Rather, the point is that *Section (a)*— the lead phrase for the *entire Section*—controls *all* of the following subsections, *including* (a)(1) (which the Government cites) and (a)(4) (where the BACT obligation resides). And Section (a) is quite clear that no facility "*may be constructed* . . . unless" the various requirements in the subsections are first satisfied. Each of the following subsections must therefore be complied with as a condition *of construction*. The issued preconstruction permit establishes BACT

emission limits for a particular unit and particular pollutants at a particular time.

Without an issued permit, there are no emission limits to violate.

Thus, when the Government's talk of overall "structure" and verb "tense"

collides with the actual words in the statute, its argument collapses. Regardless of

the textual order of the various subsections, each subsection of 42 U.S.C. § 7475

establishes a condition of constructing or modifying, which is to be reflected in a

PSD construction permit. EPA's own regulations recognize that it is either the

*failure to obtain* a construction permit or the violation of *an issued PSD permit* that

results in a PSD violation—not *later acquiring or operating without* a PSD permit.

*See* 40 C.F.R. § 52.21(r)(1). None of the Government's cited subsections create

independent operating obligations and nakedly asserting that they do cannot make

it so. To the contrary, "the obligation to apply [BACT]—like all the violations

alleged in the New Source Review counts of the complaint in this suit—was solely

a prerequisite for approval of the modification, not a condition of [] lawful

operation . . . ." *TVA 11th Cir.*, 502 F.3d at 1324 (emphasis added).[10]

*Third*, the Government's attempt to divine a freestanding BACT obligation

---

[10] The only case the Government cites to support its textual argument, the unpublished *Sierra Club v. Dairyland Power Coop.*, No. 10-cv-303-bbc, 2010 WL 4294622 (W.D. Wis. Oct. 22, 2010), was incorrect. (U.S.Br.28.) Indeed, Judge Crabb, who authored the opinion, candidly acknowledged that it was (1) contrary to the weight of the authority, (2) contrary to the only two circuit courts to consider the issue on the basis of a SIP that is similar to Pennsylvania's, and (3) an about-face from one of her own prior decisions. 2010 WL 4294622, at *9-11.

from the Pennsylvania SIP fares no better. The three BACT regulations the

Government cites, 40 C.F.R. § 52.21(j)(1), (2) and (3), incorporated into the SIP at

25 Pa. Code §§ 127.81-.83, do not stand for the proposition that "any new or

modified facility . . . 'shall apply'" BACT. (U.S.Br.24-25; St.Br.38.) Just like

§ 7475(a)(4), those provisions (which are designed to implement § 7475) create

preconstruction requirements to be addressed in an issued PSD permit and then

require facilities to follow all limitations that have *been set* in that permit. They do

not impose a general obligation to apply some free-floating BACT standard that

has never been determined, whenever a source may be operating. *See* 40 C.F.R.

§ 52.21(j)(1) ("shall meet each *applicable* emissions limitation") (emphasis

added); *Otter Tail Power Co.*, 615 F.3d at 1016-17 ("The context of § 52.21(j)(3)

shows that the command to apply BACT is not a freestanding requirement. Rather,

it is tied specifically to the construction process."); *TVA 11th Cir.*, 502 F.3d at

1325 & n.2 (holding that identical "shall apply" regulatory language required

BACT for "proposed modifications, with no caveat continuing the obligation for

the operating life of the source if it was not met during the construction phase");

*Sierra Club v. Otter Tail Corp.*, 608 F. Supp. 2d 1120, 1127 (D.S.D. 2009).

    *Fourth*, the Government's argument makes no sense in the real world.

BACT does not exist in the abstract. It is an "emissions limitation" based on "the

maximum degree of reduction for each pollutant subject to regulation under [the]

Act which would be emitted from any proposed major stationary source or major modification." 40 C.F.R. § 52.21(b)(12); *see also id.* § 52.21(j), (r). It is determined prior to construction (or modification) for a specific unit and pollutant, only after considering "energy, environmental, and economic impacts and other costs." 42 U.S.C. §§ 7479(3), 7602(k). BACT thus varies over time from plant to plant and modification to modification, depending on many specific factors.

In short, BACT is not (and cannot be) as the Government suggests, some brooding pollution control obligation in the sky. (U.S.Br.26.) BACT is (and must be) crafted by the Administrator, "on a case-by-case basis," as part of the permitting process. 40 C.F.R. § 52.21(b)(12); *see also id.* § 52.21 (j), (r); *TVA 11th Cir.*, 502 F.3d at 1325 (BACT is a "set of source-specific emission limitations determined by the Director before construction begins"); *Otter Tail Power Co.*, 615 F.3d at 1011. For until an owner or operator submits a permit application proposing BACT, that application is reviewed, and a PSD permit establishing BACT limitations is issued by the permitting authority (PADEP in Pennsylvania), a unit has no BACT limitations. *See* 40 C.F.R. § 52.21(b)(12), (j), (r).

The States cite four cases that they claim "held that a purchaser could be required to apply BACT." (St.Br.50.) All are irrelevant. *United States v. Illinois Power Co.*, 245 F. Supp. 2d 951 (S.D. Ill. 2003), was a Title V case that turned on "a genuine issue of material fact regarding whether the permits in effect at the time

of the modifications were sufficient to cover the modifications made," *id.* at 959. The opinion says nothing about an ongoing obligation to apply BACT in the abstract. Indeed, it *rejects* the notion of continuous violations: "[T]he plain language of the [PSD] provisions demonstrates that any preconstruction violation occurs *when the actual construction is commenced*, and not at some later point in time." *Id.* at 957 (emphasis added).

Another of the States' authorities, *New Jersey v. Reliant Energy Mid-Atlantic Power Holdings, LLC*, No. 07-CV-5298, 2009 WL 3234438, at *15-16 (E.D. Pa. Sept. 30, 2009), simply rewrote the PSD provisions on the basis of its own "logic." As another court observed in rejecting this approach, rewriting the PSD provisions implicates "a legislative choice that lies outside the province of this Court." *Am. Elec. Power Serv.*, 2006 WL 1331543, at *4.

*New York v. Niagara Mohawk Power Corp.*, No. 02-cv-24S, 2003 WL 23356447, at *3 (W.D.N.Y. Dec. 31, 2003), is another Title V decision. There, the court granted leave to add Title V claims only because the plaintiff was *not* trying to impose "additional substantive requirements," but was rather invoking (then-unnamed) substantive requirements from elsewhere in the CAA, *id.* at *2. Here, by contrast, the States are asking this Court to *create* substantive BACT requirements. Finally, *United States v. Louisiana Generating, LLC*, No. 09-100-JJB-CN, 2011 WL 6012997 (M.D. La. Dec. 1, 2011), relies on the Fifth Circuit's

decision in *Marine Shale*, *id.* at *11—a decision that was incorrect on numerous

fronts, as explained *supra* at 26.

Tellingly, despite the Government's musings about BACT in the abstract,

and its claim that "the United States and state enforcement authorities can readily

prove" the violation of BACT outside the permitting process (U.S.Br.26), it has

*never actually asserted* what BACT is for the Units.  This belies the Government's

assertion that the BACT determination process undertaken with the permitting

authority "merely reduces [a] pollution control obligation to numeric emission

limits."  (*Id.* at 25.)  Without that process, there are simply no BACT numeric

standards that *can be* articulated.[11]  The Government's final pronouncement, that

the United States routinely conducts "historic BACT analyses" when asking courts

to fashion retroactive standards that the Administrator never established and

impose substantial penalties based on those newly-minted and retroactively-

applied standards (*id.* at 26) is no solution, nor is it based on any legal authority.

There is simply no "way for a party who had undertaken a modification to

obtain [a BACT] determination outside the preconstruction permitting process."

---

[11] The Government's suggestion that BACT emission limitations must be
known before a BACT determination, because those limitations have to be as
stringent as the emission limitation in the NSPS regulations under § 111 of the
CAA, is equally unhelpful.  (U.S.Br.26-27.)  Under § 169(3) of the CAA (codified
at 42 U.S.C. § 7479(3)), the NSPS standards set the floor for BACT only if an
NSPS standard is "applicable."  Here, the Government has not even alleged an
NSPS "modification" that could make one of the NSPS emission limitations
applicable.  The NSPS regulations are irrelevant.

*TVA 11th Cir.*, 502 F.3d at 1325.  That is doubly true for EME and the OLs,

subsequent purchasers who are not even alleged to have undertaken the alleged

modifications.  The district court's conclusion to that effect was eminently correct.

>    **2.      The Government Has Not Identified Any Other**
>    **Pennsylvania SIP Provision That Prohibits Operation**
>    **Without A PSD Permit.**

Nor does any other provision the Government cites create a "continuing

obligation" to obtain a PSD permit as a condition to operation.

*First*, the United States cites 40 C.F.R. § 52.21(r)(6) and 57 Fed. Reg.

32,325 (July 21, 1992) for the proposition that EME and the OLs are required to

obtain PSD permits, and that failure to do so independently violates the law.

(U.S.Br.34-37.)  But § 52.21(r)(6) was not promulgated until 2002 and was

therefore *not in effect* when the alleged modifications occurred.  And even if

applicable, § 52.21(r)(6) would, at most, create a record-keeping-and-submission

requirement.  Further, both the regulation and the quoted 1992 preamble statement

are inapposite:  they apply only to operators who *commence* a project, and only to

those operators which "elect" to use a particular methodology for projecting future

emissions.  *See* 40 C.F.R. § 52.21(r)(6).  Neither imposes a blanket requirement on

plant owners.  Nor do they apply to subsequent purchasers or even purport to alter

the prohibited action that gives rise to enforcement under the PSD regulation:

"*commenc[ing] construction* . . . without applying for and receiving approval

hereunder." 40 C.F.R. § 52.21(r)(1) (emphasis added).  The States take a slightly

different tack, claiming that nothing *precludes* a party from voluntarily obtaining a

retroactive PSD permit.  (St.Br.41.)  But even assuming that is correct, it does not

mean plant owners are *required* to do so under penalty of law.  The States'

observation is meaningless.

*Second*, the Government cites to Pennsylvania's "plan approval" regulations

as evidence that the SIP imposes ongoing operational requirements such as BACT.

(U.S.Br.38-41.)  The "plan approval" program, however, differs in many ways

from the separate PSD program, which is the CAA construction-permitting

program for major sources incorporated into the Pennsylvania SIP in a different

section of the regulations.  *See* 25 Pa. Code § 127.81, *et seq.*  Unlike PSD, the

"plan approval" program does not impose BACT requirements.  *See* 25 Pa. Code

§ 127.11, *et seq.*  Moreover, the specific "plan approval" provisions cited by the

Government (25 Pa. Code §§ 127.11,127.12, 127.25) do not support its position.

Those provisions, like the PSD regulations, require only that a person (1) apply for

and obtain plan approval before commencing construction and then (2) operate in

accordance with the submitted application and issued "plan approval."  They do

not prohibit operation without a construction permit.

*Third*, the Government cites 25 Pa. Code § 127.21 (now 25 Pa. Code

§ 127.443(a)) for the proposition that a person operating a long-ago-modified

source must retroactively obtain a PSD preconstruction permit.  (U.S.Br.41-44.)
But § 127.21 refers to Pennsylvania's "plan approval" requirements, *not* PSD
requirements.  *See* 25 Pa. Code § 127.11 ("Plan approval requirements").  So *even
if* EME or the OLs had violated § 127.443, such a violation would neither give rise
to PSD liability nor impose any BACT obligations.

    And of course, it is clear that EME and the OLs never violated § 127.443(a).
That provision simply requires operators of certain sources to obtain "a permit to
operate the source."  25 Pa. Code § 127.443(a).  As discussed below, EME and the
OLs currently have and always have had such a permit.  That is all Pennsylvania
law requires.  Section 127.443(a) does not require EME and the OLs to obtain a
special operating permit relating to long-ago modifications.  Nor does the
provision create free-standing substantive obligations or require operators to
retroactively obtain preconstruction permits.  A subsequent provision in the
Pennsylvania code, 25 Pa. Code § 127.445(a), confirms this straightforward
interpretation.  That section empowers PADEP to "issue an *operating* permit to an
existing and operating source that is out of compliance with the act" and provides a
mechanism for bringing a source into compliance with applicable requirements.
25 Pa. Code § 127.445(a) (emphasis added).  It thus enables sources that never
obtained *any* operating permit—or that are out-of-compliance with an *existing
operating* permit—to get one.  It says nothing, however, about retroactively

obtaining *preconstruction* permits.

The Pennsylvania provisions are thus different from the Tennessee provision at issue in *TVA 6th Cir.* The Government repeatedly cites *TVA 6th Cir.* for the proposition that failing to apply BACT is an ongoing violation, *e.g.*, U.S.Br.44, but the provisions there only confirm the wrongness of the Government's position here. In *TVA 6th Cir.*, the Court analyzed a Tennessee SIP provision that expressly provided that if "a source or modification was constructed without *first obtaining* a construction permit" *then* "a construction permit *may be issued* to the source or modification *to establish* . . . the necessary emission limits and requirements." Tenn. Comp. R. & Regs. § 1200-3-9-.01(1)(e) (emphases added). Tennessee's provision thus does exactly what Pennsylvania's provisions do not: it requires operators to retroactively obtain PSD construction permits for sources where construction occurred without a permit. *Id.* The quotation the Government invokes (U.S.Br.33) leaves out the key portion of the Sixth Circuit's reasoning; namely that "*[u]nder § 1200-3-9-.01(4)(j)* [the Tennessee SIP provision], failing to apply BACT is actionable, and this cause of action manifests itself anew each day a plant operates without BACT limits on emissions." *TVA 6th Cir.*, 480 F.3d at 419 (emphasis added).

The Eleventh Circuit made this very point in *TVA 11th Cir.* There, the court explained that—unlike Tennessee, but like Pennsylvania—"Alabama limited the

obligation to apply [BACT] to proposed modifications, with no caveat continuing the obligation for the operating life of the source if it was not met during the construction phase." *TVA 11th Cir.*, 502 F.3d at 1325. So, whereas the Tennessee SIP "creat[ed] an ongoing obligation to comply with requirements of the preconstruction permitting process," there was no "analogous provision in the Alabama Plan." *Id.* Pennsylvania likewise has no "analogous provision," so the Government's attempts to claim that the Pennsylvania and Tennessee SIPs are the same must fail. Neither EME nor the OLs can be held liable for violating the CAA based on alleged modifications made over a decade before they acquired the Units.[12]

### C.  The Government's PSD Penalty Claims Are Barred By The Statute Of Limitations.

As explained above, a PSD violation occurs no later than the time of construction or modification. The Government's claims for civil penalties are based on alleged modifications that occurred no later than 1996. Those claims are thus time-barred.

It is well established—and the Government does not dispute—that PSD penalty claims are governed by the five-year statute of limitations in 28 U.S.C. § 2462. *See, e.g., Otter Tail Power Co.*, 615 F.3d at 1013; U.S.Br.6. That section

---

[12] As the States concede, the APCA claim "essentially tracks the federal claims." (St.Br.67.) This claim fails for the same reason as the States' federal claims.

requires actions for civil penalties to be brought within five years from the date a claim "first accrues." *Otter Tail Power Co.*, 615 F.3d at 1014. Here, the last of the alleged PSD violations "first accrued" when NYSEG and Penelec allegedly modified the Plant in 1996. Thus the Government's window to bring penalty claims closed in 2001, far more than five years before this action. The district court rightly held that the statute of limitations precludes civil penalties here. (A.26.)

## II. THE CLEAN AIR ACT DOES NOT AUTHORIZE THE GOVERNMENT OR THE STATES TO SUE SUBSEQUENT PURCHASERS WHO DID NOT COMMIT ANY ALLEGED VIOLATIONS.

Nor may EME and the OLs be sued for NYSEG and Penelec's alleged violations of the PSD provisions over a decade ago. The CAA imposes significant, "quasi-criminal" penalties for culpable conduct, *United States v. AM Gen. Corp.*, 34 F.3d 472, 474 (7th Cir. 1994), and nothing in the CAA or its implementing regulations imposes liability on innocent purchasers and operators who never violated the CAA.

The broad CAA enforcement provision under which the Government brings its PSD claims provides that only the CAA violator may be sued for PSD violations. With respect to a "person" who owns or operates a "major emitting facility," that section provides:

(b) The Administrator shall, . . . in the case of *any person* that is the

-42-

owner or operator of . . . a major emitting facility, . . . commence a civil action for a permanent or temporary injunction, or to assess and recover a civil penalty of not more than $25,000 per day for each violation, or both, in any of the following instances:

(1) Whenever *such person has violated*, or is in violation of, any requirement or prohibition of an applicable implementation plan or permit . . . .

42 U.S.C. § 7413(b)(1) (emphases added).  By its plain terms, § 7413(b) authorizes enforcement against a "person that is the owner or operator" of a "major emitting facility" only if "*such person*" has violated, or is in violation of, a SIP provision. *Id.* (emphasis added).  Here, "such" represents "the object as already particularized in terms which are not mentioned, and is a descriptive and relative word, referring to the last antecedent."  Black's Law Dictionary 1432 (6th ed. 1990); *see also, e.g.*, The New Oxford American Dictionary 1689 (2d ed. 2005) ("such" is "of the type previously mentioned").  Two centuries of precedent confirm this understanding.[13]

---

[13] *E.g., United States v. Bowen*, 100 U.S. 508, 512 (1879) (word modified by "such" refers back to last prior antecedent use of that word); *United States v. Gooding*, 25 U.S. (12 Wheat.) 460, 476-77 (1827) (where a statute outlawed fitting out a ship in the United States for use in the slave trade and causing "such ship or vessel to sail from any port," "'[s]uch ship or vessel' must, therefore, refer to a ship or vessel so built [or] fitted out" in the United States, and not in a foreign jurisdiction: "If we were to adopt any other construction, we should read the words as if 'such' were struck out, and the clause stood 'any ship or vessel.'") (emphasis omitted); *Gallo Cattle Co. v. USDA*, 159 F.3d 1194, 1197-98 (9th Cir. 1998) ("The word 'such' in [7 U.S.C.] § 4509(b) . . . necessarily refers back to the 'ruling on the petition' made by the [USDA] pursuant to § 4509(a)"); *Int'l B'hood of Elec. Workers, Local 336 v. Ill. Bell Tel. Co.*, 496 F.2d 1, 3 (7th Cir. 1974) ("[T]he language Congress chose prohibits the financing of 'any such action,' which refers back to the right of a member 'to institute an action in any court.'").

Accordingly, the CAA's text permits PSD enforcement against a person who owns

or operates a major facility *only* if *that* person has violated PSD requirements.

Here, neither EME nor the OLs are alleged to have modified the Units.

(A.27.)  Because neither EME nor the OLs violated the PSD provisions, and

because 42 U.S.C. § 7413(b)(1) allows a suit against a "person" only if "such

person" has violated PSD, neither EME nor the OLs can be subject to

enforcement.[14]

## III.   THE GOVERNMENT'S ALLEGED "POLICY CONCERNS" ARE BASELESS AND DO NOT CHANGE THE CAA'S PLAIN TEXT.

The Government devotes an entire section of its brief to the alleged

"perverse" incentives that it says will arise if this Court applies the CAA's PSD

and enforcement provisions as written.  (U.S.Br.45-50.)[15]  But the Government's

claims that the CAA's PSD penalties are "inadequate" and that companies will

begin intentionally evading regulation are simply scare tactics that cannot alter the

statutory text.

*First*, the Government argues that "a company that modifies a facility

---

[14] The citizen suit provision under which the States assert their claims is even clearer that only actual violators may be sued.  It authorizes suits only against "any person *who proposes to construct or constructs* any new or modified major emitting facility without a permit . . . or who is alleged to have violated . . . or to be in violation of *any condition of such permit*."  42 U.S.C. § 7604(a)(3) (emphases added).  As the Government concedes, EME and the OLs neither constructed anything nor violated any conditions of any issued permits.  They thus cannot be sued under the citizen-suit provision either.

[15] The States, for their part, rely almost exclusively on policy arguments.

-44-

without obtaining a PSD permit or installing pollution controls would be subject to a maximum total civil penalty of $37,500," which is "laughably inadequate to encourage PSD compliance." (U.S.Br.46; St.Br.60.) Not so. As one district court noted, this argument ignores that a party "may be subject to injunctive remedies that can include shutting down the new construction or requiring extensive (and expensive) modifications," such that "a $[37,500] penalty does not amount to a cost-free decision for defendant." *Midwest Generation, LLP*, 694 F. Supp. 2d at 1008 (quotation omitted). Further, "multi-day penalties may apply for violations of other statutory provisions under the CAA." *Id.* As written, the CAA's provisions thus fully ensure PSD compliance. The Court should not rewrite the text to solve a non-existent problem.

*Second*, the Government's complaint that the district court's ruling will enable, if not encourage, conspiracies between sellers and buyers to illegally modify sources before sale, so that buyers can take plants free of regulation, is equally misplaced. For one thing, the CAA includes *criminal penalties* for companies and individuals that "knowingly violate[]" its provisions. *See* 42 U.S.C. § 7413(c)(1). Possible criminal punishment obviously creates a powerful deterrent against attempting to circumvent the CAA's preconstruction permit requirements. Perhaps that is why the Government never claims that Penelec, NYSEG, EME, or the OLs *actually* schemed to avoid regulation. The Government's assertion that a

-45-

conspiracy "is not a hypothetical" (U.S.Br.49) is hyperbole. The Government has never alleged a conspiracy here. Nor is there basis to do so.

For another thing, the Government can enjoin any such construction *before* it is completed. 42 U.S.C. § 7477. The Government was also fully capable of obtaining all information necessary to investigate timely any purported modification here. *See, e.g.*, 42 U.S.C. § 7414 (empowering the EPA to obtain extensive documentation and evidence from sources). Yet the Government has "failed to plead any facts to explain the nearly two decade delay in enforcement," A.31, and nothing in the CAA suggests that the Government may dither for *over a decade* before trying to suddenly impose penalties on new purchasers or different operators who *never* violated the CAA.[16]

*Finally*, and perhaps most fundamentally, the Government fails to inform the Court that there are numerous avenues through which it has imposed—and can continue to impose—emissions limitations on existing plants for which a prior owner did not obtain PSD permits. The district court sensibly found that the

---

[16] Ironically, the States suggest that *subsequent purchasers*—rather than regulators—should be responsible for enforcing the CAA. They should be required, the States suggest, to inspect a seller's records, determine whether past work counted as "major modifications" that ought to have spurred a Government suit, and, if so, alert the Government of the need for an enforcement action. (St.Br.46-51.) The States cite no authority for their attempt to enlist purchasers as front-line regulators. None exists. In reality, purchasers would reasonably believe that past modifications were not "major" if the Government—armed with vastly superior investigative powers—did nothing in response to the modification and allowed the statute of limitations to run.

Government's "theory of harm is undercut" by this simple reality. (A.31.) For instance, federal regulations allow revisions to the Pennsylvania PSD program whenever necessary to prevent significant deterioration of air quality. *See* 40 C.F.R. § 51.166(a)(3). These regulations require Pennsylvania to propose and submit for EPA approval a revision to the SIP if the current plan is "substantially inadequate to prevent significant deterioration." If the EPA disapproves of the revision, then it may itself revise the Pennsylvania SIP to impose requirements necessary to "prevent significant deterioration" of air quality. *See id.* Further, significant pollution controls are already being implemented at the Units, as the Government acknowledges.[17] *See* U.S.Br.10 n.1; St.Br.19 n.3. Thus, to the extent the Government believes Penelec's and NYSEG's alleged modifications to the Plant necessitate further emissions reductions, it has options.

While the Government might feel litigation is more convenient than these

---

[17] Indeed, the Secretary of PADEP recently asked EPA to discontinue this litigation because "[a] great victory has already been won with respect to Homer City. So2 (sulfur dioxide) controls are being installed which will result in a dramatic decrease in emissions." Kathy Mellot, *State goes to bat for power plant*, The Tribune-Democrat (Sept. 18, 2012) (quoting letter from PADEP to EPA), *available at* http://tribune-democrat.com/local/x72191550/State-goes-to-bat-for-power-plant. This request is judicially noticeable. *See, e.g.*, *Ieradi v. Mylan Labs., Inc.*, 230 F.3d 594, 598 n.2 (3d Cir. 2000) (judicial notice of a newspaper article); *United States v. Pozsgai*, 999 F.2d 719, 731 (3d Cir. 1993).

alternative regulatory paths,[18] that is not a reason for this Court to rewrite the PSD

preconstruction permit rules, incorporate operating prohibitions that EPA has never

adopted, and penalize EME or the OLs for a prior owner's alleged unlawful

construction.  And that is the crux of this case.  Putting aside the Government's

policy arguments, what the Government truly seeks is for this Court to re-write the

CAA so it can sit idly by while an owner or operator constructs a source, then

years (or decades) later, at its whim, spring PSD claims against whomever then

happens to own or operate the source—even if that is someone for whom PSD

compliance would have been impossible.  To borrow a phrase, "[t]hat scenario is

not a hypothetical."  (U.S.Br.49.)  It happened here.

The Government's request is for Congress, not the courts.  As the law

exists—now and at the time Penelec and NYSEG allegedly modified the Units—

the district judge's rulings are unimpeachable.

## IV.    THE GOVERNMENT'S TITLE V CLAIMS ARE MERITLESS.

Seeking to avoid the statutory bars on its PSD claims, the Government

recasts its PSD claims as independent violations of Title V.  Specifically, the

Government argues that: (i) Title V incorporates PSD and BACT requirements;

and (ii) EME and the OLs are operating pursuant to an "inadequate" Title V

---

[18] The United States explicitly relied on the ease of litigation in a similar lawsuit in Illinois.  *See* Opening Brief, *United States v. Midwest Generation LLC*, No. 09-cv-5277 (N.D. Ill.), Docket No. 45 at 17, n.12.

permit, in violation of 42 U.S.C. § 7661a.  (U.S.Br. 51-53, 54-55; St.Br. 64-65.)

These claims are nothing more than an attempt to end-run the statutory limits on

the Government's PSD claims.  The district court properly dismissed them, finding

that Title V does not impose freestanding requirements.  (A.33.)

"On its face, Title V does not incorporate compliance with the PSD program

as a condition of a Title V permit."  *Id.*  Rather, 42 U.S.C. § 7661a makes clear that

the only conduct Title V prohibits is operating without a Title V permit or in

violation of a permit's express terms.  Title V also expressly "shields" permittees

that operate in compliance with its terms from liability under 42 U.S.C. § 7661a,

the statutory basis of the Government's claims here.  *See* 42 U.S.C. § 7661c(f).

Because the Government concedes, as it must, that the Plant has been operated

pursuant to a facially-valid Title V permit since 2004, and because the States have

failed to allege facts sufficient to support their claim that the Plant is operating in

violation of its Title V permit, the Government's Title V claims fail.

## A.    Title V Does Not Create An Independent Cause Of Action For PSD Violations.

The Government's Title V claims are based entirely on EME's and the OLs'

alleged failure to comply with PSD's BACT requirement.  The Government

attempts to graft the BACT requirements onto Title V, thereby creating an ongoing

operating violation, and thus avoiding the statutory limits on liability for one-time

PSD violations.  The statute's clear language bars this creative endeavor.

-49-

The CAA's text provides for only two types of Title V violations: (i) operating without a Title V permit; or (ii) operating in violation of the terms of a Title V permit:

> After the effective date of any permit program approved or promulgated under this subchapter [*i.e.*, Title V], it shall be unlawful for any person to violate any requirement of a permit issued under this subchapter [i.e., Title V], or to operate an affected source . . . except in compliance with a permit issued by a permitting authority under this subchapter [i.e., Title V]. (Nothing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification.)

42 U.S.C. § 7661a(a). Title V does *not* magically incorporate the PSD requirements as conditions of Title V permits. Rather, it simply consolidates otherwise-applicable CAA requirements into a single operating permit and then requires compliance with that permit. *See Citizens Against Ruining the Env't v. EPA*, 535 F.3d 670, 672 (7th Cir. 2008); *see also* 42 U.S.C. §§ 7661a(a); 7661c(a); 40 C.F.R. §§ 70.1(b), 70.2 (defining "[a]pplicable requirement"). If a PSD preconstruction permit has never issued, it is not part of a Title V permit. Title V does not somehow expand the scope of the PSD provisions—"[n]othing in this subsection shall be construed to alter the applicable requirements of this chapter that a permit be obtained before construction or modification," 42 U.S.C. § 7661a(a)—as the district court recognized. (A.33.) The Government thus cannot resuscitate its PSD claims by shoehorning them into Title V. *See United States v. Midwest Generation, LLC*, 781 F. Supp. 2d 677, 690-91 (N.D. Ill. 2011)

("Plaintiffs cannot slip their PSD claims through the back door by recharacterizing them as Title V claims.").

### B.   Title V Does Not Authorize "Inadequate" Permit Claims.

Recognizing that Title V does not create new claims, the Government asserts that EME and the OLs are operating pursuant to an "inadequate" Title V permit. But the CAA does not authorize this sort of derivative claim either.  *See, e.g.*, *United States v. Cemex, Inc.*, 864 F. Supp. 2d 1040, 1049-50 (D. Colo. 2012) ("The Court sees no possible interpretation of this language that would permit a cause of action for the failure to obtain a 'proper' operating permit.").  Courts are "not free to fashion unprecedented and unusual alternative remedies that have no foundation in the terms of the [Clean Air] Act or in the Act's legislative history."  *Sierra Club v. Indiana-Kentucky Elec. Corp.*, 716 F.2d 1145, 1154 (7th Cir. 1983).  The Government's "inadequate" permit claims thus fail too.  *Id.*

The Government claims that Title V incorporates PSD requirements through statutory and regulatory provisions referencing "applicable requirements under this chapter" and "enforceable emission limitations and standards."  *See* U.S.Br. 51-52 (citing 42 U.S.C. §§ 7661b, 7661c).  But these provisions merely describe the content of Title V permit applications and establish rules for permitting authorities. Their substance simply adopts *preexisting* "applicable requirements" or "limitations" or "standards."  But absent a PSD permit, there are no BACT

requirements for a Title V permit to incorporate, *see, e.g.*, *Midwest Generation*,

781 F. Supp. 2d at 690; *supra* at 29-37, which is why no Court of Appeals has ever

allowed a Title V permit claim like the Government's.

The cases the Government does invoke, U.S.Br.54, are distinguishable or

incorrect. Foremost, the judge who decided *Pennsylvania v. Allegheny Energy,*

*Inc.*—the district judge in this case—has since declared that decision "no longer

correct" in light of "[s]ubsequent developments in the law." (A.35 n.15.) *New*

*York v. Niagara Mohawk Power Corp.*, for its part, simply said that leave to amend

a complaint to add a "deficient operating permit" claim should be "freely given"

under the liberal standard for amending complaints, refusing to entertain arguments

regarding the claim's legal merits. No. 02-CV-245, 2003 WL 23356447, at *1, *3

(W.D.N.Y. Dec. 31, 2003). Finally, *United States v. Louisiana Generating, LLC*,

relied in large part on *Allegheny Energy* and *Niagara Mohawk* and, for that reason,

was wrongly decided too.[19] *See* No. 09-100-JJB-CN, 2011 WL 6012997, at *12-

14 (M.D. La. Dec. 1, 2011).

The absence of an "inadequate" permit claim makes sense given the many

statutory mechanisms the Government possesses to remedy alleged deficiencies in

Title V permits. Foremost, the CAA is clear that any challenges outside the

---

[19] *Louisiana Generating* also relied on *United States v. East Kentucky Power Cooperative*, but that decision analyzed the wrong permit shield. *See* 498 F. Supp. 2d 1010 (E.D. Ky. 2007).

standard administrative review process can and must be filed "in the United States Court of Appeals for the appropriate circuit."  42 U.S.C. § 7661d(b)(1).[20]  Further, EPA has authority to object to the issuance of a Title V permit it deems deficient. *See* 42 U.S.C. § 7661d(b)(1); 40 C.F.R. § 70.8(c).  And to the extent the Government claims the alleged deficiency was not known until several years after issuance of the Title V permit, EPA or PADEP may, when appropriate, reopen the permit to add any "applicable requirement" that was improperly omitted.  *See* 42 U.S.C. § 7661d(e); 40 C.F.R. § 70.7(f); 25 Pa. Code §§ 127.542, 127.543.  Indeed, here, the Government had *another* opportunity to object, when the Title V renewal permit was issued in November 2012, yet it remained mute.  What the Government cannot do, however, is use Title V to end-run the clear statutory limits on PSD liability.  *See also AM Gen. Corp.*, 34 F.3d at 475 (failing to "find in the text of the Clean Air Act, or elsewhere, any indication that Congress expressly or by implication meant to authorize the EPA" to launch an enforcement action against an operator that "had been operating under a permit valid on its face and never before challenged").

---

[20] As the former owners explain, such challenges cannot, however, be filed in the first instance in district court in the guise of "enforcement" proceedings. (Fmr.Owner.Br.10-11, 47-50.)

**C.    Title V's "Permit Shield" Provision Confirms That The Government's Derivative Title V Claims Are Not Actionable.**

The first sentence of 42 U.S.C. § 7661c(f) explicitly precludes liability here. That provision provides that anyone who complies with a Title V permit cannot be held liable for violating Title V:  "Compliance with a permit issued in accordance with this subchapter shall be deemed compliance with section 7661a of this title." *Id.*  Regardless of the other CAA requirements, this provision definitively precludes Title V liability for operators who comply with the terms of their Title V permits.  Because the Government concedes the validity of the Title V permit, the United States concedes compliance with that permit's terms, and the States do not sufficiently plead noncompliance with that permit (*infra* at 55-56), § 7661c(f) shields EME and the OLs from Title V liability.

The Government's assertion that the permit shield "does not insulate a plant owner or operator for operating with an incomplete and inadequate permit" misreads § 7661c(f).  (U.S.Br. 55-57.)  Section 7661c(f) contains two separate permit shields.  The first, quoted above, shields operators from *Title V* liability under § 7661a.  The second, not at issue here, shields operators from violations of "*other applicable provisions* of [the CAA]" if the Title V permit either includes those requirements or expressly states that the permitting authority has determined those requirements are inapplicable.  42 U.S.C. § 7661c(f) (emphasis added).  Despite the clear distinction between the two shields, the Government improperly

-54-

conflates them, arguing that neither applies here because the Title V permit

contained no BACT limitations.  (U.S.Br. 56.)  The omission of BACT limitations

here simply means that the *second* shield relating to "other applicable provisions of

this chapter"—which EME and the OLs have never invoked—does not insulate

EME and the OLs from liability under *other* parts of the CAA.  This second shield

has *nothing* to do with the *first*, which precludes *Title V liability* where, as here,

EME and the OLs have complied with every term in the Title V permit.[21]

The Government thus again seeks to rewrite the CAA to suit its purposes—

here, by asking this Court to read into the first sentence of § 7661c(f) the condition

that the permit shield is triggered "only if the Title V application is complete."

(U.S.Br. 57.)  Again, this effort fails.  Dismissal of these claims was proper.

> **D.    The States Have Not Alleged Sufficient Facts In Support Of Their Claimed Violation Of EME's And The OLs' Title V Permit.**

In addition, the States, for their part, assert various permit *violations*, but

their Complaints merely recite numerous permit *conditions*, including one that

requires Homer City to "operate in accordance with the specifications in the

applications and the conditions in the plan approval and operating permit issued by

---

[21] The Government's conflation of the two shields is especially glaring in its invocation of *Citizens Against Ruining the Environment*, 535 F.3d at 678. (U.S.Br.57.)  While that case did note that EPA has "broad enforcement authority . . . to bring an enforcement action for violations of the CAA unless an express 'shield' on the face of the permit bars that action," 535 F.3d at 678, the court was referring only to the *second* shield and the EPA's authority to bring enforcement actions for *underlying* violations of the CAA.

the [PADEP]." (R.10, ¶ 154.)  The States allege no facts actually showing a

violation of this (or any other) provision and they cannot cure that deficiency by

making never-before-seen allegations on appeal in a footnote.  (St.Br. 66 n.17.)

Because the States did not allege facts showing a Title V violation, the district

court was correct to dismiss their Title V claims too.  *See Ashcroft v. Iqbal*, 556

U.S. 662, 678 (2009).

Finally, to the extent the States have pleaded a cognizable Title V permit

violation, it *still* must be dismissed for lack of jurisdiction.  As intervenors, the

States may not assert claims beyond those raised by the United States unless they

satisfy the pre-suit requirements to a CAA citizen suit.  42 U.S.C. § 7604.  That

provision—which is jurisdictional—requires the States to give 60-days notice

before commencing a citizen suit alleging a CAA violation.  42 U.S.C.

§ 7604(b)(1)(A); *Pub. Interest Research Group of New Jersey, Inc. v. Windall*, 51

F.3d 1179, 1189 n.15 (3d Cir. 1995) (analogous Clean Water Act requirement is a

"jurisdictional prerequisite").  The States' notices of violation that preceded this

suit did not identify any violations of the Title V permits. (R.3-3, 40-3.)  Because

the United States did not allege any such violations, and the States failed to satisfy

the notice requirement, this claim fails for lack of jurisdiction.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated:  January 14, 2013

Respectfully submitted,

/s/ Chet Thompson

Chet M. Thompson
Jeffrey L. Poston
David Y. Chung
Providence Spina
CROWELL & MORING
1001 Pennsylvania Avenue, N.W.
Washington, DC 20004-2505
Telephone: 202-624-2500

Peter T. Stinson
W. Alan Torrance, Jr.
DICKIE, MCCAMEY & CHILCOTE
Two PPG Place
Suite 400
Pittsburgh, PA 15222
Telephone: 412-392-5432

*Attorneys for Homer City OL1, LLC;*
*Homer City OL2, LLC; Homer City*
*OL3, LLC; Homer City OL4, LLC;*
*Homer City OL5, LLC; Homer City*
*OL6, LLC; Homer City OL7, LLC; and*
*Homer City OL8, LLC*

 /s/ James M. Jones

James M. Jones
Rebekah B. Kcehowski
JONES DAY
500 Grant Street, Suite 4500
Pittsburgh, PA 15219
(412) 391-3939

Stephen J. Bonebrake
Andrew N. Sawula
SCHIFF HARDIN LLP
233 S. Wacker, Suite 6600
Chicago, IL 60606-6473
Telephone: (312) 258-5500
Facsimile: (312) 258-5600

Kevin P. Holewinski
Thomas J. Davis
James M. Burnham
JONES DAY
51 Louisiana Avenue, N.W.
Washington, DC 20001
(202) 879-3939

Daniel E. Reidy
Brian J. Murray
JONES DAY
77 W. Wacker, Suite 3500
Chicago, IL 60601
(312) 782-3939

*Attorneys for Defendant-Appellee EME*
*Homer City Generation, L.P.*

## COMBINED CERTIFICATIONS

I, James M. Jones, hereby certify:

1.  That this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  That this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced serif typeface using Microsoft Office Word 2007 in 14-point Times New Roman font.

3.  Pursuant to Local Rule 46.1, that James M. Jones is a member in good standing of the bar for the United States Court of Appeals for the Third Circuit.

4.  That the text of the electronic brief is identical to the text in the paper copies.

5.  That a virus detection program (McAfee VirusScan Enterprise, Version 8.7i) has been run on the electronic file and no virus was detected.


Dated:  January 14, 2013

/s/ James M. Jones
James M. Jones

## CERTIFICATE OF SERVICE

The undersigned attorney hereby certifies that the RESPONSE BRIEF FOR

DEFENDANTS-APPELLEES EME HOMER CITY GENERATION, L.P. AND

HOMER CITY OL1-OL8, was filed electronically with the Clerk of the Court for

the United States Court of Appeals for the Third Circuit using the appellate

CM/ECF system.  Participants in the case who are registered CM/ECF users will

be served by the appellate CM/ECF system.

Dated:  January 14, 2013

/s/ James M. Jones
James M. Jones