IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 11-4406, 11-4407, 11-4408 (consol.)

---

**UNITED STATES OF AMERICA, *et al.*,**

*Plaintiffs-Appellants,*

*v.*

**EME HOMER CITY GENERATION, L.P., *et al.*,**

*Defendants-Appellees.*

---

On Appeal from the U.S. District Court for
the Western District of Pennsylvania,
No. 2:11-cv-19-TFM (Hon. Terrence F. McVerry).

---

**REPLY BRIEF FOR THE UNITED STATES**

ROBERT G. DREHER
Acting Assistant Attorney General

*Of Counsel:*
PHILLIP A. BROOKS
APPLE CHAPMAN            AARON P. AVILA
SEEMA KAKADE             JOHN W. SITHER
DONNA MASTRO             KATHERINE VANDERHOOK-GOMEZ
U.S. Environmental       KATHERINE J. BARTON
 Protection Agency       ROBERT J. LUNDMAN
 1200 Pennsylvania Ave., NW   U.S. Department of Justice
 Washington DC 20640      Environment & Nat. Res. Div.
                          P.O. Box 7415
                          Washington, DC 20044
                          (202) 514-2496

# TABLE OF CONTENTS

INTRODUCTION ........................................................................ 1

ARGUMENT ............................................................................. 2

I.    Homer City violates the Clean Air Act and the State Implementation Plan each day it operates the "modified" plant without the required pollution controls and permit ..... 2

    A.    Homer City violates the ongoing and operational BACT pollution control obligation every day ............... 2

        1.    The BACT obligation does not *end* at Construction ........................................................ 2

        2.    The BACT obligation applies even if BACT is not specified in a PSD permit .............................. 9

    B.    Homer City is violating PSD permitting obligations every day ...................................................... 11

    C.    Pennsylvania's State Implementation Plan prohibits operating a facility without complying with PSD requirements ................................................... 14

    D.    The district court's opinion generates perverse incentives ...................................................... 18

II.    Defendants violated Title V by submitting an incomplete permit application and operating the plant pursuant to the inadequate permit that resulted ..................................... 24

III.    An injunction is available against the former owner-operators to remedy the ongoing and uncontrolled pollution from the plant .......................................... 27

CONCLUSION ........................................................................ 35

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF DIGITAL SUBMISSIONS

CERTIFICATE OF BAR MEMBERSHIP

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**

*Alabama Power v. Costle,*
     636 F.2d 323 (D.C. Cir. 1979) ........................................................28

*Citizens Against Ruining the Environment v. EPA,*
     535 F.3d at 678 (7th Cir. 2008)......................................................26

*Doeblers' Pennsylvania Hybrids, Inc. v. Doebler,*
     442 F.3d 812 (3d Cir. 2006)............................................................28

*eBay Inc. v. MercExchange,*
     L.L.C., 547 U.S. 388 (2006) ...........................................................31

*In re Avandia Mktg., Sales Practices & Prods. Liab.,*
     685 F.3d 353 (3d Cir. 2012).....................................................22, 28

*Monsanto Co. v. Geertson Seed Farms,*
     130 S. Ct. 2743 (2010) ....................................................................31

*Nat'l Parks Cons. Ass'n Inc. v. TVA,*
     480 F.3d 410 (6th Cir. 2007) ..........................................................18

*New York v. EPA,*
     413 F.3d 3 (D.C. Cir. 2005) ............................................................10

*Sierra Club v. Dairyland Power Coop.,*
     2010 WL 4294622, 14 (W.D. Wis. 2010) ......................................13

*Sierra Club v. Franklin County Power of Ill., LLC,*
     546 F.3d 918 (7th Cir. 2008) ............................................................8

*United States v. Am. Elec. Power Serv. Corp.,*
     136 F. Supp.2d 808 (S.D. Ohio 2001)......................................22, 23

*United States v. Chevron, U.S.A. Inc.,*
        757 F. Supp. 512 (E.D. Pa. 1990) ................................................... 23

*United States v. Cinergy Corp.,*
        618 F. Supp. 2d 942 (S.D. Ind. 2009),
        *rev'd on other grounds,* 623 F.3d 455 (7th Cir. 2010) ................... 32

*United States v. East Ky. Power Co-op,*
        498 F. Supp. 2d 1010, 1018 (E.D. Ky. 2007) ................................. 26

*United States v. Lane Labs-USA Inc.,*
        427 F.3d 219 (3d Cir. 2005) ............................................................ 30

*United States v. Louisiana Generating, LLC,*
        2011 WL 6012997 (M.D. La. Dec. 1, 2011) ................................... 20

*United States v. Price,*
        688 F.2d 204 (3d Cir. 1982) ............................................................ 32

*United States v. Telluride Co.,*
        146 F.3d 1241 (10th Cir. 1998) ...................................................... 22

*Wis. Elec. Power Co. v. Reilly,*
        893 F.2d 901 (7th Cir. 1990) .......................................................... 20

**STATUTES:**

Clean Air Act

        42 U.S.C. § 7401(b)(1) ...................................................................... 5

        42 U.S.C. § 7411(a)(4) ...................................................................... 7

        42 U.S.C. § 7413 ........................................................................ 6, 7, 15

        42 U.S.C. § 7413(b) ......................................................... 6, 7, 30, 32

        42 U.S.C. § 7470(1) ..................................................................... 5, 10

42 U.S.C. § 7475(a) ........................................................ 4, 5, 11, 12

42 U.S.C. § 7475(a)(1) ............................................ 4, 5, 9, 11, 12, 32

42 U.S.C. § 7475(a)(3) .............................................................. 5

42 U.S.C. § 7475(a)(4) ...................................... 2-5, 9-11, 32

42 U.S.C. § 7475(a)(7) .............................................................. 5

42 U.S.C. § 7477 ................................................................. 6, 7

42 U.S.C. § 7479(2)(C) ....................................................... 4, 16

42 U.S.C. § 7479(3) ...................................................... 2, 3, 10, 11

42 U.S.C. § 7602(k) ........................................................... 3, 10

42 U.S.C. § 7661a(a) .......................................................... 14, 25

42 U.S.C. § 7661a(b)(1) ............................................................ 27

42 U.S.C. § 7661b(b)(1) ............................................................ 24

42 U.S.C. § 7661c(a) ......................................................... 24, 25

42 U.S.C. § 7661c(f) ................................................................ 27

42 U.S.C. § 7661d(b)(1) ............................................................ 26

28 U.S.C. § 2462 ..................................................................... 22

## FEDERAL RULES AND REGULATIONS:

40 C.F.R. § 52.21(b)(21)(v) (2000) ........................................... 13

40 C.F.R. § 52.21(r)(1) ............................................................... 5

40 C.F.R. § 52.21(r)(6) ................................................................. 13

40 C.F.R. § 70.2 .......................................................................... 25

40 C.F.R. § 70.5(a), (b), & (d) .............................................. 26, 27

45 Fed. Reg. 52,676 (Aug. 7, 1980) ................................. 5, 12, 15

57 Fed. Reg. 32,314 (July 21, 1992) ............................................ 5

76 Fed. Reg. 48,208 (Aug. 8, 2011) .......................................... 33

**PENNSYLVANIA ADMINISTRATIVE CODE:**

25 Pa. Code § 121.1 .................................................................... 16

25 Pa. Code § 127.4 ............................................................. 14, 27

25 Pa. Code § 127.11 ....................................................... 16, 17, 18

25 Pa. Code § 127.12 ................................................................. 17

25 Pa. Code § 127.12(a)(5) .................................................. 16, 17

25 Pa. Code § 127.12(b) ...................................................... 16, 17

25 Pa. Code § 127.12b ............................................................... 16

25 Pa. Code § 127.13a ............................................................... 16

25 Pa. Code § 127.13b(b) ........................................................... 16

25 Pa. Code § 127.21(1989) ...................................................... 17

25 Pa. Code § 127.25 ................................................................. 16

25 Pa. Code § 127.414 ............................................................... 27

vi

25 Pa. Code § 127.443(a) ................................................... 17, 18

25 Pa. Code § 127.443(b) ......................................................... 17

25 Pa. Code § 127.444............................................................. 17

25 Pa. Code § 127.445(a) ......................................................... 18

## LEGISLATIVE HISTORY:

S. Rep. No. 101-228 (1989),
   *reprinted in* 1990 U.S.C.C.A.N. 3385 ................................................ 7

136 Cong. Rec. 36007 (1990) ..................................................... 8

# GLOSSARY

| | |
|---|---|
| BACT | Best Available Control Technology |
| EPA | U.S. Environmental Protection Agency |
| Homer City | EME Homer City Generation, L.P. and Homer City OL1 to OL8, LLCs |
| NYSEG | New York State Electric and Gas Corporation |
| OLs | Homer City OL1 to OL8, LLCs |
| Penelec | Pennsylvania Electric Co. |
| the plant | Homer City Generating Station Units 1 and 2 |
| PSD | Prevention of Significant Deterioration |
| SIP | State Implementation Plan |

## INTRODUCTION

Homer City successfully explains when a Prevention of Significant Deterioration (PSD) violation *begins* – it begins at the time of construction.[1]  But Homer City cannot explain why a PSD violation *ends* at the same time, at the time of construction.  Defendants' argument turns the PSD program of the Clean Air Act – a program to control the pollution that continues unabated from the plant today – into a statute regulating only the construction of plants.  Nor do defendants' other arguments justify the district court's erroneous result: that a modified plant can continue to pollute without satisfying PSD requirements merely because the plant was sold.

---

[1]    In this brief, "Homer City" refers collectively to the current owners and operators, EME Homer City Generation, L.P. and Homer City OL1-OL8, LLCs, who filed a brief together.  Pennsylvania Electric Company (Penelec) and New York State Electric & Gas Corporation (NYSEG) also filed a brief together.

Defendants note that ownership of the Homer City plant has shifted again, albeit to a corporation ultimately owned by some of the same corporate entities.  Homer City Br. 2 n.1.  We agree with defendants that this development does not affect the issues in this appeal.

# ARGUMENT

**I.    Homer City violates the Clean Air Act and the State Implementation Plan each day it operates the "modified" plant without the required pollution controls and permit.**

**A.    Homer City violates the ongoing and operational BACT pollution control obligation every day.**

**1.    The BACT obligation does not *end* at construction.**

Homer City argues that the "best available control technology" or "BACT" requirement of Section 165(a)(4) ends "after the facility is 'constructed.'"  Homer City Br. 30.  That cramped reading of the Act is inconsistent with the statutory text and common sense.  Two aspects of the statutory language pertaining to BACT make it clear that BACT is an ongoing, operational requirement that extends beyond the time of construction.

The first is the statute's definition of BACT.  Congress defined BACT as "an emission limitation."  42 U.S.C. § 7479(3).  Homer City claims (p. 29) that this "definitional provision says nothing about when or how BACT is determined or applied."  But this is plainly incorrect.  The statute not only defines BACT as an "emission limitation" but defines "emission limitation" as a limit that applies "on a continuous basis" and includes "any requirement relating to the operation" of a

source.  *Id.* § 7602(k).  Thus BACT is not just a construction requirement; it is an operational requirement as well.

The second is the language of Section 165(a)(4), which says that "the proposed facility *is subject to* the best available control technology for each pollutant subject to regulation under this chapter emitted from, or which results from, such facility."  42 U.S.C. § 7475(a)(4) (emphasis added).  A modified facility that "is subject to" BACT must meet an ongoing and operational BACT-based emission limitation.  Section 165(a)(4) thus does not impose an obligation only at the time of construction.

Moreover, defendants simply ignore how BACT actually functions when an operator complies with the statute.  When an operator modifies a plant and follows the statutory requirements, it must comply with BACT-based emission limitations that govern ongoing operations, not construction.  U.S. Op. Br. 21-23.  It makes no sense for BACT to apply only at the time of construction, when the plant is not operating and thus not emitting pollutants.

Homer City relies heavily on the prefatory language of Section 165(a) and its title referencing construction and preconstruction to

argue that Section 165(a) applies only at the time of construction. Homer City Br. 21-22.  But these provisions establish only that the Section 165(a) obligations *begin* at construction, not that they *end* at construction too.  The title of Section 165 is "Preconstruction Requirements," and it starts with the following language:  "No major emitting facility on which construction is commenced after August 7, 1977, may be constructed in any area to which this part applies [i.e., an attainment area, *see* U.S. Op. Br. 4] unless * * * ."  42 U.S.C. § 7475(a). Section 165(a) of the Act thus imposes various "[p]reconstruction requirements" on a facility undertaking a major modification.  42 U.S.C. §§ 7475(a), 7479(2)(C).  The statute requires plant operators to address these obligations before construction begins.

But if an operator ignores the obligations, the statute does not say that their violation *ends* when construction begins.  The statute's reference to "construction" does not make it merely a construction permitting program.  The sub-provisions of Section 165(a) clearly impose ongoing, operational requirements that are triggered in the first instance by construction.  *See id.* § 7475(a)(4) (discussed above); *see also id.* § 7475(a)(1) (permit "setting forth emission limitations"); *id.*

§ 7475(a)(3) (emissions from "construction or operation" must comply with Act); *id.* § 7475(a)(7) (authorizing post-construction air quality monitoring).

EPA's implementing regulations dutifully track the statute's ongoing mandate, contrary to Homer City's argument (p. 32). For instance, the regulations provide that violations of the PSD program begin with construction of a modification, but they do not end there. 40 C.F.R. § 52.21(r)(1). EPA has explained that "[a]ny source which improperly avoids review and commences construction will be considered in violation of the applicable [State Implementation Plan] and will be retroactively reviewed under the applicable [New Source Review] regulation." 45 Fed. Reg. 52,676, 52,725 (Aug. 7, 1980); *accord* 57 Fed. Reg. 32,314, 32,325 (July 21, 1992).

Moreover, the Clean Air Act's concern is *pollution*, not *construction*. Congress enacted the PSD program "to protect public health and welfare from any actual or potential adverse effect which in the Administrator's judgment may reasonably be anticipate[d] to occur from air pollution." 42 U.S.C. § 7470(1); *see also id.* § 7401(b)(1).

5

The Clean Air Act enforcement provisions do not indicate that the PSD obligations apply only at the time of construction, as Homer City argues.  Defendants attempt to shift the focus away from the enforcement provision the government has invoked here, 42 U.S.C. § 7413, titled "Federal Enforcement."  That provision authorizes the government to "commence a civil action" for an "injunction," "civil penalty," and/or "any other appropriate relief" for violations of "this subchapter," which includes Section 165.  *Id.* § 7413(b).  That provision is not limited to illegal construction or modification of facilities.  It provides, among other things, for per day penalties, indicating that ongoing violations are intended and anticipated.  *Id*.  Homer City relies on 42 U.S.C. § 7477 (pp. 22-23), which authorizes EPA to seek an injunction preventing the construction or modification of a major emitting facility, among other things.  But that provision does not supplant or limit EPA's authority under 42 U.S.C. § 7413.  It simply underscores that a violation of Section 165 begins at construction but does not end then, and it does nothing to limit the United States' enforcement authority to remedy the ongoing illegal pollution from any illegally modified plant.

The legislative history cited by Homer City (pp. 22-23) is not to the contrary. It shows only that Congress decided not to add the term "operation" when it added "modification" to 42 U.S.C. § 7477. *See* S. Rep. No. 101-228, at 376 (1989), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3759. But that history provides no context or explanation that would lend any significance to that decision. In fact, adding "operation" was completely unnecessary for two reasons. First, 42 U.S.C. § 7413 already authorized the United States to enforce the PSD operational obligations. Second, the Act defines "modification" to include a "change in the method of *operation*"; thus adding operation was unnecessary and redundant. *Id.* § 7411(a)(4) (emphasis added).

Moreover, other legislative history from 1990 directly addresses this issue and shows that Congress understood that EPA could already initiate enforcement actions against sources violating the operational new source requirements. The conference agreement was described in this way: "the agreement recognizes existing law which allows EPA to initiate enforcement actions against sources that are being constructed or modified in violation of new source requirements, and *leaves intact the current interpretation of the Agency that allows action against*

7

*sources that are operating in violation of new source requirements.*" 136

Cong. Rec. 36007, 36086 (1990) (Chafee-Baucus Statement of Senate

Managers, S. 1630, The Clean Air Act Amendments of 1990, describing

conference agreement; emphasis added).

Homer City's reliance (p. 22) on *Sierra Club v. Franklin County*

*Power of Ill., LLC*, 546 F.3d 918 (7th Cir. 2008), in support of its

"construction only" argument is misplaced.  There, unlike here, the

operator applied for and received a PSD permit.  *Id.* at 923-24.  The

relevant question before the Seventh Circuit was whether Sierra Club's

claim that the operator needed a new permit before construction was

ripe.  *Id.* at 928.  In holding that the claim was ripe, the court

established only when a claim can first be brought; it did not rule on the

issue of whether the violation is an ongoing one.  *Id.* at 928-29.  By

contrast, the question here is, once triggered, when does PSD liability

end?  The correct answer is also the one that comports with common

sense: so long as the plant continues to emit pollution uncontrolled by

BACT and without PSD permits, the plant continues to be in violation

of the Act.  *See also* States Reply Br. 17-18 (explaining that PSD

requirements apply to the facility, regardless of whether ownership

changes).

### 2. The BACT obligation applies even if BACT is not specified in a PSD permit.

Homer City argues that it cannot violate the BACT obligation

because it was not set forth in a PSD permit.  Homer City Br. 29-32.

This argument amounts to nothing more than a claim that two wrongs

make a right: because they never complied with the obligation to secure

a permit under Section 165(a)(1), they could not have violated the

BACT obligation in Section 165(a)(4).  Their argument fails because the

BACT obligation in Section 165(a)(4) is independent from the permit

obligation in 165(a)(1); nothing in (a)(4) conditions liability on securing

a permit.  U.S. Op. Br. 23-30.

Homer City complains that "BACT is not (and cannot be) * * *

some brooding pollution control obligation in the sky"; it must be

defined in a permit.  Homer City Br. 34.  But the statute imposes the

BACT obligation, and the obligation applies both before and after it is

specified in a permit.  If Homer City wants its BACT obligation specified, all it needs to do is apply for a PSD permit.[2]

To be sure, BACT is typically specified during the permitting process.  When an operator applies for a permit, the State and EPA then specify BACT – i.e., the pollution controls and "emission limitations" – in the permit that ultimately issues.  42 U.S.C. §§ 7479(3), 7602(k).  But that does not mean that an operator either satisfies or does not trigger the BACT obligation by ignoring the permit obligation too.  The precise BACT standard for a particular source need not be pre-determined for an operator to violate the BACT obligation.  When an operator modifies an old, grandfathered plant that lacks any semblance of modern pollution controls without applying any new pollution control equipment or methods (as happened here), then it is

_____

[2]     In our opening brief, we explained that Congress has established statutory guideposts and a floor for BACT.  U.S. Op. Br. 27; *New York v. EPA*, 413 F.3d 3, 13 (D.C. Cir. 2005) ("'In no event shall application of [BACT] result in emissions of any pollutants which will exceed the emissions allowed by any applicable standard established pursuant to' NSPS." (quoting 42 U.S.C. § 7479(3)).  Homer City offers no response to the argument that this sets a floor for BACT; they instead offer a diversion about the circumstances in which the floor is triggered.  Homer City Br. 36 n.11.

plain that the operator is not operating the plant using the "best available control technology." *Id.* § 7475(a)(4).

For these reasons, the BACT obligation in Section 165(a)(4) imposes ongoing, operational requirements. It is not just a construction obligation. A plant operator thus violates the BACT obligation when it operates the plant without BACT.

## B. Homer City is violating PSD permitting obligations every day.

The Clean Air Act not only establishes an ongoing BACT pollution control obligation, it also imposes an ongoing PSD *permitting* obligation. U.S. Op. Br. 34-38. In response, Homer City primarily relies on the argument that we have disproved above: that Section 165(a) imposes only preconstruction obligations. It does not; the Section 165(a) obligations *begin* at construction but do not *end* there.

With respect to the Section 165(a)(1) permitting obligation in particular, it is clear that the obligation begins at construction and then continues until regulators issue a PSD permit for the facility or the facility permanently stops operating. As explained in our opening brief (pp. 34-35), PSD permits are both operating permits and construction permits. Because Section 165(a) establishes that an applicant is to get

a permit before construction, it is a construction permit.  42 U.S.C.

§ 7475(a).  But the permit also governs operations: Section 165(a)(1)

requires that the permit must "set[] forth emission limitations for such

facility which conform to the requirements of this part."  *Id.*  The

provision thus requires "emission limitations," which can apply to the

plant only once it is operating.  If the permit requirement expired when

construction of the modification ended, before operations even restart,

then the "emission limitations" of the permit would be toothless.  The

obligation would expire before it would have any effect.  Homer City's

interpretation accordingly should be rejected.

Homer City states that "it is impossible to violate the terms of a

preconstruction permit that has never been issued."  Homer City Br. 27.

This misstates our argument.  Homer City has violated the obligation to

secure a permit, not the terms of a permit that it has never even applied

for.

Homer City is also wrong when it claims that it cannot get a PSD

permit after construction.  Homer City Br. 34.  EPA is on record as

saying that Homer City can apply for a permit, and that EPA and the

State would process such a permit application.  45 Fed. Reg. at 52,725.

Nothing in the statute or the regulations bars such an application. There is no provision, for example, saying that EPA will not process a PSD permit application after construction is complete. Homer City could apply for a permit today to address its ongoing PSD obligations. *See Sierra Club v. Dairyland Power Coop.*, 2010 WL 4294622, at *14 (W.D. Wis. Oct. 22, 2010); *see also* U.S. Op. Br. 35-36, 43-44.[3]

Homer City incorrectly suggests (pp. 8-9) that the operating provisions of PSD permits are enforceable only through Title V permits. The operating provisions of PSD permits are independently enforceable. Congress did not enact Title V until *thirteen years after* creating the PSD permitting program. U.S. Op. Br. 37-38; *Dairyland*, 2010 WL 4294622, at *13. And Congress explained that "*nothing* [in the new Title V program] shall be construed to alter" existing PSD permitting requirements. 42 U.S.C. § 7661a(a) (emphasis added).

---

[3]    Homer City mistakenly argues (p. 39) that the modifications predate ongoing PSD permit requirements because they predate 40 C.F.R. § 52.21(r)(6). The prior version of the regulation, in place since 1992, is not materially different. *See* 40 C.F.R. § 52.21(b)(21)(v) (2000) (in place from 1992 to 2002, and providing for monitoring of operations following change to ensure that change did not result in an emissions increase; attached as Exhibit A to Homer City's brief).

### C.    Pennsylvania's State Implementation Plan prohibits operating a facility without complying with PSD requirements.

As an initial matter, Homer City errs when it suggests that the United States did not bring a claim based on Pennsylvania's SIP. Homer City Br. 5, 13-14.  We did.  The complaint alleges that the defendants violated the State SIP.  The very first paragraph of the complaint provides that "[t]his is a civil action brought against [defendants] * * * for injunctive relief and assessment of civil penalties for violations of: (1) [the federal PSD provisions of the Act and regulations]; (2) the federally approved and enforceable Pennsylvania State Implementation Plan ('Pennsylvania SIP'); and (3) [Title V] and the Pennsylvania Title V Program * * *."  JA 65-66 (¶ 1).  In the claims themselves, the complaint then specifically alleges violations of the SIP. JA 82 (¶¶ 69, 70); JA 85 (¶¶ 80, 81).  The complaint describes the SIP provisions at issue as well.  JA 76-77 (¶¶ 44, 45).

These SIP provisions directly rebut Homer City's two primary arguments: that the PSD obligations apply only at the time of construction and that there is nothing they can do now, since they acquired the plant after construction of the modifications.  U.S. Op. Br.

14

38-44.  The SIP requires an operator to secure a "plan approval" that governs ongoing *operations*, not just construction, as detailed below. The SIP directs operators to secure such a permit after construction as well, just as EPA explained was required under the PSD regulations. 45 Fed. Reg. at 52,725 (explaining that sources remain liable for coming into compliance with PSD for prior modifications).  Even were the Clean Air Act and EPA's regulations ambiguous with respect to the BACT and permit obligations, Pennsylvania's SIP makes plain that BACT and permit obligations impose operational obligations, not just construction requirements.  And violation of a State's SIP is independently enforceable by the United States in court.  42 U.S.C. § 7413; U.S. Op. Br. 5.

Homer City offers very little in response to the plan approval provisions.  They summarily and incorrectly claim that the SIP provisions we cited in our opening brief are irrelevant.  Homer City Br. 38.  These "plan approval" provisions require that the plan approval permit govern the operation of the plant, not just construction, and require that the operator satisfy the BACT obligation.  The SIP requires that a plan approval application "[s]how that the emissions from a new

source will be the minimum attainable through the use of the best available technology" and the plan approval permit will not be approved unless the application does so.  25 Pa. Code § 127.12(a)(5), (b); *see also id.* §§ 121.1, 127.11; 42 U.S.C. § 7479(2)(C).  The SIP then prohibits "the operation of a source" except in compliance with the "plan approval": "[a] person may not cause or permit the operation of a source subject to § 127.11 (relating to plan approval requirements), unless the source and air cleaning devices identified in the application for the plan approval and the plan approval issued to the source, are operated and maintained in accordance with specifications in the application and conditions in the plan approval issued by the Department."  *Id.* § 127.25; *see also id.* §§ 127.12b, 127.13a, 127.13b(b); JA 107-10.  The plan approval requirements are clear and directly resolve the issues in this appeal.

Moreover, in addition to the plan approval provisions, the SIP requires an operating permit that demonstrates compliance with PSD requirements.  As explained in our opening brief (pp. 41-42), the grant of a plan approval triggers the requirement that the operator seek an

operating permit. *Id.* § 127.443(a).[4]  The operating permit incorporates

the terms of the plan approval. *Id.* § 127.443(b); *see also id.* § 127.444;

JA 107-10. The operator then must operate the plant consistent with

its operating permit, which includes the plan approval criteria.

Homer City claims (p. 39) that 25 Pa. Code § 127.443(a) only

requires a permit to operate and it has one. But as set forth above, the

SIP does not just require a permit, it requires a permit that both

governs operations and demonstrates compliance with BACT – i.e., that

"[s]how[s] that the emissions from a new source will be the minimum

attainable through the use of the best available technology." 25 Pa.

Code § 127.12(a)(5), (b). Their operating permit does not even address

BACT, so it cannot satisfy this obligation set forth in the SIP.

Finally, contrary to Homer City's argument (p. 25), the

Pennsylvania SIP also includes a separate provision just like the one in

the Tennessee SIP that the Sixth Circuit held clearly provided an

---

[4]    Section 127.443 went into effect on August 29, 1996, and it applies
to the operation of the units from that date forward. 25 Pa. Code
§ 127.21 (1989) (JA 234), which contained substantially the same
language, was in effect at the time of the Homer City Plant
modifications and thus applied to the past owners. Minor, non-
substantive changes were made to the language of Sections 127.11,
127.12, and 127.25 as well.

independent basis for extending the PSD requirements to operations, not just construction. *Nat'l Parks Cons. Ass'n Inc. v. TVA*, 480 F.3d 410, 418-19 (6th Cir. 2007). There, the Sixth Circuit held that plaintiffs alleged two separate types of ongoing violations: (1) the violation of the requirement in the PSD regulations that a major modification "shall apply" BACT (the same BACT requirement we have alleged was violated in this case, *see supra* 2-9), and (2) the failure to comply with a separate Tennessee SIP provision that provided for after-the-fact permits for illegal modifications. *Id.* Just like the second provision in the Tennessee SIP, the Pennsylvania SIP allows an operator to apply for an operating permit after the operator has completed a modification that should have been subject to plan approval. 25 Pa. Code § 127.445(a) ("The Department may issue an operating permit to an existing and operating source that is out of compliance with * * * the Clean Air Act or the regulations thereunder").

## D.   The district court's opinion generates perverse incentives.

As explained in our opening brief (pp. 45-50), the interpretation of the statute by the district court and defendants creates two perverse incentives: (1) it discourages companies from seeking PSD permits, and

(2) it encourages companies to "re-grandfather" modified plants by selling the plants after illegally modifying them.

In response, Homer City claims that these concerns are misplaced. But it is undisputed for purposes of this appeal that Penelec and NYSEG modified the plant and did not apply for a permit or install BACT. They then sold the plant to Homer City. U.S. Op. Br. 10 (describing sale and related transactions). No one ever applied for a permit or installed BACT. Pollution that would have been abated by BACT continues from the plant, at a rate of approximately 100,000 tons of sulfur dioxide per year. JA 8, 67. And now defendants argue that no one can be held responsible. This is exactly the problem.

Homer City's interpretation of the statute allows plant operators to evade ongoing BACT and permit obligations by ignoring them. According to Homer City, once the operator constructs the modification of its plant without complying with PSD, the violation is complete. Under this rationale, the operator incurs a *total* one day penalty of $37,500, even if the operator continues operating the facility without BACT or a permit. Homer City Br. 44-54. A one-time penalty of $37,500 will do nothing to ensure compliance with the Act, which can

19

cost hundreds of millions of dollars.  U.S. Op. Br. 46-47.  And, according to defendants, an injunction is impossible as well if the plant is sold, because the violation is wholly in the past.  Penelec-NYSEG Br. 28-35; Homer City Br. 21-28.

Defendants' interpretation also encourages companies to transfer ownership of illegally modified plants in order to avoid not only the liability for past violations but also the potentially costly BACT requirement.  By barring both penalties and injunctive relief once a plant is sold, the district court mapped a tempting path for companies that want to operate facilities without regard to the PSD program.  U.S. Op. Br. 48-50.  The facts of this case are not unique; plant sales are common within the power and industrial sectors.  *See, e.g., United States v. Louisiana Generating, LLC*, 2011 WL 6012997, at *7-8 (M.D. La. Dec. 1, 2011) (addressing such a sale).  These are not "imaginary policy horribles" (Homer City Br. 4); they are *real* policy horribles.[5]

---

[5]    Homer City mischaracterizes our argument when they claim (p. 45) that we are arguing that there will be "conspiracies" between sellers and buyers of modified plants.  We have not argued that operators are "conspiring" criminally; we have argued that the district court's interpretation creates a loophole and incentive, enticing operators to ignore the PSD provisions.  Moreover, Homer City incorrectly claims that potential criminal liability might reduce the potential impact of

In response to these "policy horribles," defendants point to other Clean Air Act programs and Pennsylvania's and EPA's authority to amend the SIP. Homer City Br. 46-48; Penelec-NYSEG Br. 53-55. But companies have to comply with the entire Clean Air Act; they do not get to pick and choose which parts to comply with. Moreover, none of the other Clean Air Act programs cited by defendants would reduce pollution from these plants as substantially as applying BACT – the "best available control technology" – would. *See, e.g., Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 496-501 (upholding EPA conclusion that BACT requires most stringent yet feasible pollution control). And the SIP here already imposes ongoing and operational requirements as discussed above; amending the SIP is thus unnecessary.

Homer City also argues that it "is entirely reasonable" to absolve them of any liability because it can be difficult to determine if a plant was modified in a manner that triggers the PSD obligations. Homer City Br. 27. The issue of whether the plant was modified is not before the Court in this appeal because the district court dismissed the

this incentive. If the district court is affirmed, there would be no liability at all for this massively polluting conduct.

government's complaint before even reaching the issue. Homer City accuses the government of "entirely skip[ping] over the predicate question of whether Penelec's and NYSEG's alleged 'modifications' would have required a PSD preconstruction permit in the first place." Homer City Br. 17. But we have not skipped over that issue. We pleaded in the complaint that the modifications triggered BACT and PSD permit obligations. JA 81-86. And at this stage of the litigation (a motion to dismiss) that factual allegation is taken as true. *In re Avandia Mktg., Sales Practices & Prods. Liab.*, 685 F.3d 353, 357 (3d Cir. 2012). While it can be complicated to determine whether a modification occurred, that is no reason to give subsequent owners and operators a free pass  to operate a modified plant without pollution controls.

Finally, defendants allege that the government's delay in bringing this suit supports dismissal. Homer City Br. 19, 46; Penelec-NYSEG Br. 50-53. It does not. The five-year statute of limitations applies only to penalty claims, not injunctive relief. 28 U.S.C. § 2462; U.S. Op. Br. 4; *see, e.g., United States v. Telluride Co.*, 146 F.3d 1241, 1245-48 (10th Cir. 1998); *United States v. Am. Elec. Power Serv. Corp.*, 136 F. Supp.2d

808, 810-11 (S.D. Ohio 2001).  Moreover, the statute of limitations does not bar the claim that Homer City is continuing to violate the PSD provisions by operating the plant without BACT and without permits.

Defendants' invocation of delay as a justification for dismissing the suit is essentially an attempt to apply laches against the government.  The "delay" argument fails because laches is generally not available against the government when it seeks to protect the public interest.  U.S. Op. Br. 68-69.  The ongoing harm from the unabated pollution from the plant – harm to the public, not direct harm to EPA or the United States as a government –demonstrates that delay does not justify dismissing this case at the pleading stage.  *See United States v. Chevron, U.S.A. Inc.*, 757 F. Supp. 512, 515 (E.D. Pa. 1990) ("In this instance, the EPA is enforcing the Clean Air Act, which is of paramount importance to the American citizenry.  * * * We do think, however, that the public should not be punished for any alleged negligence on the part of EPA enforcement.  Therefore, the defense of laches is not applicable in this case.").

Defendants are also wrong in suggesting that the government should have known about the modifications here much earlier.  As their

brief and the district court opinion both explain, a plant operator has no

obligation to report to the government all changes to a plant.  If a plant

operator either believes that a change to a plant does not constitute a

modification or chooses to ignore the law, then nothing is reported

either to the State or EPA.  It is hardly surprising that it may take

years – during which the plant might be sold – for a governmental

entity to discover a modification.

## II.    Defendants violated Title V by submitting an incomplete permit application and operating the plant pursuant to the inadequate permit that resulted.

Defendants' briefs do not justify the district court's dismissal of

the government's Title V claims.  Defendants are incorrect that Title V

does not require that plant operators have a complete permit.  Homer

City Br. 50-51; Penelec-NYSEG Br. 45-46.  The Title V permit

application must include "a compliance plan describing how the source

will comply *with all applicable requirements under this chapter*."  42

U.S.C. § 7661b(b)(1) (emphasis added); *see also id.* § 7661c(a) ("Each

permit issued under this subchapter shall include enforceable emission

limitations and standards * * * and such other conditions as are

necessary to assure compliance *with applicable requirements of this*

*chapter*, including the requirements of the applicable implementation plan." (emphasis added)); *id.* § 7661c(a) (requiring Title V permits to include "enforceable emission limitations * * * and such other conditions as are necessary to assure compliance with applicable requirements of this chapter"). "[C]hapter" refers to the entire Clean Air Act, thus including the PSD program. And the regulations define "[a]pplicable requirement" to include PSD requirements contained in a SIP. 40 C.F.R. § 70.2; *see* U.S. Op. Br. 51-52. These provisions do not "merely describe the content of Title V permits applications" (Homer City Br. 51); they mandate complete applications and set forth the specific requirements that must be included in a Title V permit.

It follows that Homer City violated Title V by operating the plant without a Title V permit that includes all applicable requirements. 42 U.S.C. § 7661a(a) provides that "it shall be unlawful * * * to operate [a covered source] except in compliance with a permit issued by a permitting authority under this subchapter [i.e., Title V]." The Title V permit that Homer City holds is not a permit for the plant as it currently exists. What they hold is a permit for a grandfathered, pre-modification plant, not the plant as actually modified. Until the plant's

Title V permit includes the PSD requirements applicable to a modified plant, Homer City is operating the plant in violation of Title V.

Defendants also err in arguing that the government cannot bring a Title V claim like this one in an enforcement action but instead must either bring it in the Court of Appeals or raise it in an administrative challenge to the permit itself.  Homer City Br. 52-53 (citing 42 U.S.C. § 7661d(b)(1)).  As explained in our opening brief, while EPA can object to the issuance of a Title V permit, EPA can also choose to exercise its broad enforcement authority instead, as it has here.  *See, e.g., Citizens Against Ruining the Environment v. EPA*, 535 F.3d 670, 678 (7th Cir. 2008) (describing advantages of enforcement actions); U.S. Op. Br. 57-58.  Nothing in the Act precludes an enforcement action to challenge a Title V permit.  *See, e.g., United States v. East Ky. Power Co-op, Inc.*, 498 F. Supp. 2d 1010, 1018 (E.D. Ky. 2007).

Penelec and NYSEG argue that the United States has forfeited its Title V arguments against them.  Penelec-NYSEG Br. 43-45.  We have not.  Our opening brief explained that they submitted an incomplete Title V application because it failed to address the PSD requirements, as the statute, regulations, and SIP require.  40 C.F.R. § 70.5(a), (b), &

(d); 42 U.S.C. § 7661a(b)(1); 25 Pa. Code § 127.414.  And both our complaint and our district court filings present this argument as well. U.S. Opp'n, D. Ct. R. 99, at 27-31; JA 83-84, 86-87.

Finally, Homer City is not protected by the Title V safe harbor or permit shield provision.  Homer City Br. 54-55.  The only part of the safe harbor provision that they rely on is found in the first sentence of 42 U.S.C. § 7661c(f): "Compliance with a permit issued in accordance with this subchapter [i.e., Title V] shall be deemed compliance with section 7661a of this title."  Because the Title V permit application here was inadequate and incomplete, the permit was not "issued in accordance with" Title V and the shield does not apply.  And no court has held that the permit shield provision applied where the permit application ignored modifications that triggered the PSD provisions.

## III. An injunction is available against the former owner-operators to remedy the ongoing and uncontrolled pollution from the plant.

Penelec and NYSEG, the former owners-operators, contend that, at the motion to dismiss stage, it was appropriate for the district court to dismiss even the possibility of an award of relief against them – even

assuming that they have violated the Clean Air Act. That argument is incorrect because there is no such legal bar to relief.

At the outset, Penelec and NYSEG incorrectly claim (pp. 17-18) that this Court should review the district court's order dismissing the complaint for abuse of discretion. This Court reviews *de novo* a district court's Rule 12(b)(6) dismissal for failure to state a claim on which relief can be granted. *Avandia*, 685 F.3d at 357. This Court reviews the denial of a permanent injunction for abuse of discretion where the district court has made a determination of the merits and then determined whether injunctive relief was appropriate. *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 819 (3d Cir. 2006) ("We review the grant or denial of a permanent injunction for an abuse of discretion."). Here, the district court rejected the possibility of an injunction as a matter of law at the pleading stage, so there is no exercise of discretion by the district court for this Court to review. The district court's legal determination is reviewed *de novo*. And in any event, a legal error by the district court is necessarily an abuse of discretion. *Id.* ("An abuse of discretion exists where the District Court's

decision rests upon * * * an errant conclusion of law, or an improper application of law to fact." (internal quotations omitted)).

The district court erred in denying even the possibility of injunctive relief at this stage of the litigation.  The court should not have prejudged the equitable, multi-factor balancing it is required to perform *after* making the merits determination of whether Penelec and NYSEG modified the plant without complying with their BACT, PSD permitting, and Title V obligations.[6]

As explained in our opening brief (pp. 58-67), Penelec and NYSEG err in arguing (pp. 28-35) that an injunction is warranted only to prevent an ongoing or future violation of law.  The Clean Air Act grants the district court broad injunctive and remedial authority.  The district court has the authority to enter an "injunction," as well as "jurisdiction to restrain such violation, to require compliance, to assess such civil

---

[6]    Penelec and NYSEG make a related argument (pp. 35-39) that it would be either impossible or at least difficult to craft an injunction requiring that they install pollution control equipment because the equipment is complicated and expensive.  There is no factual basis in the record (e.g., declarations or testimony) to support this argument at the motion to dismiss stage.  Penelec-NYSEG Br. 39.  Penelec and NYSEG again are attempting to prejudge the equitable and fact-intensive determination of the proper relief, which should occur after the merits determination.

penalty, to collect any fees owed the United States * * * *and to award*
*any other appropriate relief*," 42 U.S.C. § 7413(b); Penelec and NYSEG
omit this italicized language twice from their discussion of 42 U.S.C.
§ 7413(b), before finally acknowledging it.  Penelec-NYSEG Br. 19, 21,
32.  Moreover, the Act authorizes enforcement actions against both "any
person that is the owner or operator of an affected source, a major
emitting facility, or a major stationary source" as well as "any other
person."  *Id.*; *see, e.g., United States v. Lane Labs-USA Inc.*, 427 F.3d
219, 225 (3d Cir. 2005); U.S. Op. Br. 59-61.

Thus, all that is required by the Clean Air Act provision for
injunctive relief is harm that can be remedied by an injunction.  There
is ongoing harm here: the plant continues to pollute every day in
violation of the Act.  This ongoing, immediate harm is exactly the sort of
harm that justifies an injunction.

Moreover, Penelec and NYSEG (and the district court) ignored the
traditional four-factor test for a permanent injunction, which does not
require an ongoing violation of law.  Penelec-NYSEG Br. 23 (mentioning
the "usual rule" but failing to address the four factors).  It requires that
a plaintiff "demonstrate: (1) that it has suffered an irreparable injury;

(2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). None of these factors bars injunctive relief as a matter of law here; they should be assessed after a merits determination.

Penelec and NYSEG complain that the injunctive relief we seek is "mandatory" in nature, and thus should face heightened scrutiny. Penelec-NYSEG Br. 22. The injunction, however, would only be "mandatory" here because of the framework created by the statute. The Clean Air Act requires plant operators, when they modify a plant, to apply for a PSD permit (Section 165(a)(1)) and to use BACT to control pollution (Section 165(a)(4)). Because defendants have not done so, the primary injunctive relief we seek is an order that requires them to do so. Such an order would simply require them to take the actions mandated by the Clean Air Act. There is no reason to subject such an

injunction to heightened scrutiny, especially at the motion-to-dismiss stage.

Other appropriate forms of injunctive relief may also include requiring Penelec and NYSEG to purchase emissions allowances and "retire" them unused.  U.S. Op. Br. 62; *United States v. Cinergy Corp.*, 618 F. Supp. 2d 942, 956-57, 967-68 (S.D. Ind. 2009), *rev'd on other grounds*, 623 F.3d 455 (7th Cir. 2010).  This is not a penalty: it mitigates the harm from past excess emissions that are already in the environment by reducing future emissions by a corresponding amount. *See, e.g., United States v. Price*, 688 F.2d 204, 212 (3d Cir. 1982) ("The fact that an injunction may require the payment or expenditure of money does not necessarily foreclose the possibility of equitable relief."). Because the Clean Air Act establishes these allowances to regulate the same pollutant (sulfur dioxide) primarily at issue here, they are not "unrelated."  Penelec-NYSEG Br. 19-20.  An order requiring defendants to retire them would be an award of "any other appropriate relief."  42 U.S.C. § 7413(b).

Penelec and NYSEG claim (p. 24) that this potential relief has "no geographic, temporal, or logical connection to" the emission from the

plant.  But this argument is both incorrect and premature.  The

connection here is plain: because Penelec and NYSEG modified the

plant without complying with the PSD provisions, the plant *today* emits

substantially more sulfur dioxide than it would had Penelec and

NYSEG complied with the Clean Air Act.  Penelec and NYSEG's

violation of law is a but-for cause of sulfur dioxide pollution today, and

retiring sulfur dioxide allowances would offset that pollution.  The

geographic connection may not be perfect, but the pollution from the

plant has regional impacts, blanketing much of Pennsylvania, New

York, and New Jersey, all plaintiffs here.  *See, e.g.*, 76 Fed. Reg. 48,208,

48,316, 48,348 (Aug. 8, 2011) (pollutants from power plant emissions

can travel hundreds of miles).[7]

Finally, Penelec and NYSEG err in claiming that the harms they

caused are long past.  Penelec-NYSEG Br. 27.  The unabated pollution

---

[7]    Penelec and NYSEG also argue that holding them responsible for
the illegal pollution occurring today is unfair because we could still
bring such a claim in 2111.  Penelec-NYSEG Br. 25.  It is difficult to
imagine that defendants could operate a plant built in 1969 for more
than 140 years pursuant to the *temporary* grandfathering program
established by Congress.  *See, e.g., Wis. Elec. Power Co. v. Reilly*, 893
F.2d 901, 909-10 (7th Cir. 1990) ("Congress did not permanently exempt
existing plants"); *Alabama Power v. Costle*, 636 F.2d 323, 400 (D.C. Cir.
1979) (no "perpetual immunity" for grandfathered sources).

from the plant today is directly traceable to Penelec and NYSEG's decisions to modify the plant without installing BACT and without applying for a PSD permit in violation of the Clean Air Act. This illegal pollution results in irreparable harm to public health and the environment. The district court has the authority to issue an equitable remedy against Penelec and NYSEG.

* * *

In conclusion, adopting defendants' and the district court's interpretation of the statute would lead to untenable results. When an operator modifies a plant without complying with either the BACT or PSD permit requirements, the operator would be subject to a one-day penalty of $37,500. Injunctive relief would be available at first, but as soon as the plant is sold, injunctive relief would be impossible against both the past and new operators and owners. Pollution would continue unabated. As explained above, however, Congress did not enact such a self-defeating system in the Clean Air Act. And the State SIP here definitively resolves the question. This Court should follow the Act's text, structure, and purpose so as to properly allocate incentives to

protect human health and the environment consistent with Congress'

intent.

## CONCLUSION

This Court should reverse the judgment below.

Respectfully submitted,

ROBERT G. DREHER
 Acting Assistant Attorney General

*Of Counsel:*
PHILLIP A. BROOKS
APPLE CHAPMAN          /s/ Robert J. Lundman
SEEMA KAKADE           AARON P. AVILA
DONNA MASTRO           JOHN W. SITHER
U.S. Environmental     KATHERINE VANDERHOOK-GOMEZ
 Protection Agency     KATHERINE J. BARTON
 1200 Pennsylvania Ave., NW  ROBERT J. LUNDMAN
 Washington DC 20640      U.S. Department of Justice
                          Environment & Nat. Res. Div.
                          P.O. Box 7415
                          Washington, DC 20044
                          (202) 514-2496

February 8, 2013
90-5-2-1-09334/1

# CERTIFICATE OF COMPLIANCE
# WITH TYPE VOLUME LIMITATION

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 6,966 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  The brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because I prepared it using Microsoft Office Word 2007 and 14-point Century Schoolbook type.

/s/ Robert J. Lundman
ROBERT J. LUNDMAN
U.S. Department of Justice
Environment & Nat. Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-2496
robert.lundman@usdoj.gov

## CERTIFICATE OF DIGITAL SUBMISSIONS

I certify that this brief has been submitted in PDF format to the

Third Circuit's Electronic Case Filing System.

1. I certify that the text in the electronic submission of this brief is

identical to the text in the hard paper copies of the Brief filed with

the Court; and

2. I certify that the electronic version of this Brief has been

scanned for viruses with the Microsoft Forefront Client Security

program version 1.143.1848.0 (last updated February 7, 2013)

and, according to the program, the document is free of viruses.

<u>/s/ Robert J. Lundman</u>
ROBERT J. LUNDMAN
U.S. Department of Justice
Environment & Nat. Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-2496
robert.lundman@usdoj.gov

# CERTIFICATE OF BAR MEMBERSHIP

I certify that I am a member of the Third Circuit bar.

/s/ Robert J. Lundman
ROBERT J. LUNDMAN
U.S. Department of Justice
Environment & Nat. Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-2496
robert.lundman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 8, 2013: I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the CM/ECF system; that service on counsel of record will be accomplished by the CM/ECF system; and that ten copies of foregoing Reply Brief have been sent by Federal Express to the Clerk's Office.

/s/ Robert J. Lundman
ROBERT J. LUNDMAN
U.S. Department of Justice
Environment & Nat. Res. Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-2496
robert.lundman@usdoj.gov